**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

**Criminal Case No. 1:21-cr-123 (CMA)**

**UNITED STATES OF AMERICA**

**v.**

**GERARDO GAMEZ-REYES,**

      **Defendant.**

---

### GERARDO GAMEZ-REYES' MOTION TO DISMISS THE INDICTMENT

---

The Constitution demands that courts examine criminal statutes for evidence of discriminatory intent and disparate impact in order to ensure equal protection under the law. *Arlington Heights v. Metro. Housing Development Corp.,* 429 U.S. 252 (1977). The criminalization of reentry was motivated and perpetuated by anti-Latinx racism and has not been uncoupled from that history.

In 1924, nativist legislators succeeded in passing the National Origins Act, which set national origin-based immigration quotas, reserving 96 percent of all slots for European immigrants. However, because powerful agribusiness interests needed cheap Latinx farm labor, nativists lost several battles to place quotas on the Latinx migrants they referred to as "peons," "rat men," and "wetbacks." Their defeat was short-lived; Congress passed the first statute criminalizing illegal entry and reentry in the Undesirable Aliens Act of 1929. It was the perfect compromise to reconcile the diverging views of racists in America. For the nativists, enactment of the illegal reentry statute closed the loophole left by the National Origins Act – the failure to impose a quota on immigrants from the Western Hemisphere and prevent "mongrels" from reducing the white majority and sullying the gene pool. From the equally racist perspective of

agribusiness, "subservient" "morally inferior" Latinx workers could now enter the country to be exploited for their cheap labor, and then deported at the end of harvest season so they could not seek the rights associated with residency, impact the racial makeup of America, or "interbreed" with whites. Not only did this racism motivate the original version of 8 U.S.C. § 1326,[1] but that racism has carried forward uninterrupted and unexamined, and the law has disparately impacted Mexicans and other Latinx individuals in the ninety years since. That alone is sufficient for the Court to conclude that the statute violates the Constitution's guarantee of equal protection.

In 1952, Congress consolidated the country's immigration laws under the McCarran-Walter Act, which perpetuated the national origins quota system, including the exception for the Western Hemisphere. Once more without a quota to limit immigration from Latin America, Congress defaulted to the illegal reentry statute (now renumbered to § 1326) to achieve its explicitly stated goal of preserving America's white majority. The same Congress also worked to shield employers from repercussions for employing undocumented immigrants, further perpetuating the discriminatory intent inherent in the 1929 agreement between nativists and agribusiness. The illegal reentry statute was recodified "almost word for word" with little discussion and without evidence of legislative intent to reenact on alternative, legitimate grounds. In fact, the historical context and legislative history demonstrate the opposite: that the same racial animus and discriminatory intent that motivated the 1929 law was also a motivating factor in the 1952 recodification.

---

[1] Exhibit "T" (United States Attorneys' Bulletin, dated July 2017) at 1.

Congress has since amended §1326 five more times, once in the eighties and four times in the nineties, always to increase its retributive and deterrent effects. These amendments resulted from the convergence of a rise in nativist sentiment, scapegoating of Latinx immigrants as criminals in the War on Drugs, and the outsized influence of a eugenicist-founded anti-immigrant lobbying group – the Federation for American Immigration Reform ("FAIR") – on Congress. Because anti-immigrant and War on Drugs legislation were both wildly popular with constituents, Congressmembers from both parties were either themselves caught up in the tenor of the day or submitted to the discriminatory will of the electorate to ensure reelection. None of these reenactments involved the type of intervening event, like a substantial change to the statute or a discussion of an alternative, legitimate purpose, that could break the chain of discriminatory causation.

Mr. Gamez-Reyes will show that the 1929 provision criminalizing reentry was more likely than not motivated, at least in part, by racial animus, the burden then shifts to the government to show that the statute would have been enacted in the absence of a discriminatory purpose. Because the government cannot meet that burden, the indictment must be dismissed.

This Court would not be first to hold that §1326 violates equal protection under *Arlington Heights.* Last summer, in the District of Nevada, the Honorable Miranda M. Du held an evidentiary hearing on §1326's constitutionality. After reviewing extensive evidence and hearing expert testimony from both Professor Kelly Lytle Hernandez and Professor Benjamin Gonzalez O'Brien, Judge Du issued a thorough and well-reasoned order detailing the unlawful reentry statute's repugnant history. Judge Du held not only

that §1326 disparately impacts Latinxs, but also that Congress was motivated by racial animus when it enacted the original unlawful reentry statute in 1929, as well as when it recodified the statute in 1952. Because the government could offer no evidence that Congress would have enacted the unlawful reentry statute but for its discriminatory purpose, Judge Du ruled that "Section 1326 violates the Equal Protection Clause of the Fifth Amendment" and dismissed the indictment. *See U.S. v. Carrillo-Lopez*, ___ F.Supp.3d ___, 2021 WL 3667330 (D. Nev. Aug. 18, 2021), gov't notice of appeal filed August 19, 2021.

While the Court could decide this motion on the papers, if the Court believes Mr. Gamez-Reyes has not shown a discriminatory purpose and a disparate impact, the Court should hold an evidentiary hearing. Courts frequently hold evidentiary hearings and trials to hear evidence on the *Arlington Heights* factors. *See e.g., Hunter v. Underwood*, 471 U.S. 222, 229 (1985) (relying on evidence at trial of state legislative proceedings, "several historical studies, and the testimony of two expert historians"). Indeed, the Supreme Court has found error where a lower court granted summary judgment "without an evidentiary hearing" on a legislature's disputed motives under *Arlington Heights*. *Hunter*, 526 U.S. at 545. If the Court orders an evidentiary hearing, the defense could call expert historians Kelly Lytle Hernandez, Benjamin Gonzales O'Brien, and S. Deborah Kang, whose declarations are attached hereto as Exhibits "A," "B," and "C," respectively. The testimony of Professor Hernandez and Professor Gonzales O'Brien in the *Carrillo-Lopez* evidentiary hearing are attached hereto as Exhibit "D."

I.        **LEGAL STANDARD**

The Fifth Amendment provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws." *United States v. Windsor*, 570 U.S. 744, 774 (2013). These protections extend to those charged with violating § 1326. *Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("[W]e have clearly held that the Fifth Amendment protects aliens whose presence in this country is unlawful from invidious discrimination by the Federal Government."); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976) ("There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons from deprivation of life, liberty, or property without due process of law. Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection.").

A facially-neutral law violates the Fifth Amendment's equal protection guarantee if it has a racially disparate impact and the legislature was motivated to enact the statute at least in part by a discriminatory purpose. *See Arlington Heights*, 429 U.S. at 265–68. Disparate impact is established where the law's impact "'bears more heavily on one race than another.'" *Id*. at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).

To establish that a statute violates equal protection on the basis of racial discrimination, the challenger of the statute must prove by a preponderance of the evidence that racial discrimination was a substantial or motivating factor in the adoption of the statute. *Hunter*, 471 U.S. at 225 (citing *Arlington Heights* and *Mt. Healthy City*

*School Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 286 (1977)). However, because legislatures are rarely "motivated solely by a single concern," a challenger need not show the legislature's actions "rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265–66. Once the challenger has met its burden to show discriminatory intent and a disparate impact, the burden then shifts to the government to establish that the same decision would have resulted had the impermissible purpose not been considered. *Hunter*, 471 U.S. at 225; *see also Arlington Heights*, 429 U.S. at 270 n.21.

Although courts normally refrain from reviewing the merits of decisions by legislators and administrators, this judicial deference is no longer justified "[w]hen there is a proof that a discriminatory purpose has been a motivating factor in the decision." *Arlington Heights*, 429 U.S. at 265-66 (quoted in *Ramos v. Wolf*, 975 F.3d 872, 896 (9th Cir. 2020)). Such judicial deference should also be unwarranted when "a law originally enacted with discriminatory intent is later reenacted by a different legislature," or where the legislature "use[d] criteria that arguably carried forward the effects of any discriminatory intent on the part of" the prior legislature. *Compare Abbott v. Perez,* 138 S. Ct. 2305, 2315, 2326 (2018) (finding that "presumption of legislative good faith" applied to state legislature's redistricting plans under Voting Rights Act in part because the challenged redistricting plan was generated entirely anew after a prior plan was "immediately tied up in litigation and never used" on grounds that it was motivated by discriminatory intent).

The first stage of this burden-shifting process involves what is essentially a totality-of-the circumstances approach. In determining "the motivation behind official

action," *Hunter*, 471 U.S. at 225, the Court may consider "such direct and circumstantial evidence as may be available." *Arlington Heights*, 429 U.S. at 265; *see also Mt. Healthy*, 429 U.S. at 286-87. The threshold for meeting this initial burden is low, requiring only that it is more likely than not that racism was a motivating factor. *Hunter*, 471 U.S. at 225.

In conducting this undertaking, the Court may receive expert testimony and opinions from historians, consider records of legislative proceedings, and consider historical studies. *Id*. at 228-29. The Court may also consider direct and circumstantial evidence drawn from a range of overlapping sources, including, but not limited to, information regarding the general "historical background" at the time of the law's enactment, information regarding the "specific sequence of events leading to its enactment," and information regarding the "legislative or administrative history," including possible "[d]epartures from normal procedural sequence" or "substantive departures." *Arlington Heights*, 429 U.S. at 265-68. Determining whether a decisionmaker departs from "normal procedures or substantive conclusions"—requires courts to consider any "procedural irregularities" leading up to the enactment of a law that could signal a discriminatory intent. *Pac. Shores Properties v. City of Newport Beach*, 730 F.3d 1142, 1164 (9th Cir. 2013). Courts may also consider illogical or counterintuitive conclusions in the decision-making process. *See, e.g.*, *Ave. 6E Investments v. City of Yuma*, 818 F.3d 493, 507 (9th Cir. 2016) (citing city's decision to "disregard the zoning advice of its own experts"). Additionally, the Court may consider the impact of the official action, and whether it bears more heavily on one race than another. *Arlington Heights* at 265–68.

As in any totality-of-the-circumstances analysis involving both direct and circumstantial evidence, no specific type of evidence is required, and no specific consideration is determinative. *See, e.g., Hunter*, 471 U.S. at 229-30 (relying on proceedings of legislative convention, historical studies, and testimony of two expert historians); *Mt. Healthy*, 428 U.S. at 281-87 (remanding for consideration of totality of employee's conduct in First Amendment wrongful termination case).

If the challenger demonstrates that racial discrimination was a motivating factor, the burden then shifts to the government to establish by a preponderance of the evidence that the same decision would have resulted had the impermissible purpose not been considered. *Hunter*, 471 U.S. at 225; *see also Arlington Heights*, 429 U.S. at 270 n. 21. This causation approach is "a test of causation which distinguishes between a result caused by a constitutional violation and one not so caused." *Mt. Healthy*, 429 U.S. at 286.[2] If the government cannot carry its burden, the challenged law violates the Fifth Amendment and must be invalidated. *Arlington Heights*, 429 U.S. at 270 n.21.

## II.      ARGUMENT

8 U.S.C. § 1326 was enacted in part due to racial animus and must be struck down under the Equal Protection Clause of the Fifth Amendment, unless the government shows that the statute would have been enacted absent the discriminatory motive. *Arlington Heights*, 429 U.S. at 270 & n.21; *Hunter*, 471 U.S. at 229, 232-33. Here, the evidence shows, and courts have found, that it is more likely than not that the

---

[2] In *Mt. Healthy*, which was decided on the same day as *Arlington Heights*, the Court found support for this causation approach in its own "tainted fruit" analysis regarding the admissibility of statements, including *Wong Sun v. United States*, 371 U.S. 471 (1983). *Mt. Healthy*, 429 U.S. at 286-87 (citing *Arlington Heights* and applying burden-shifting approach to First Amendment challenge alleging wrongful termination).

first version of § 1326, which was enacted in 1929, was motivated at least in part by racial animus. *See, e.g., Carrillo-Lopez,* at *9; *U.S. v. Machic-Xiap*, ___F. Supp. 3d___, 2021 WL 3362738 at *10 (D. Or. Aug. 3, 2021).

The government cannot meet its burden under *Arlington Heights* by pointing to later iterations of the illegal reentry statute. First, the record demonstrates that in 1952 and onward, Congress reenacted "a law originally enacted with discriminatory intent." *See Abbott*, 138 S. Ct. at 2326. Accordingly, because the first iteration of § 1326 in the Undesirable Aliens Act of 1929 was enacted in part due to racial animus, and because later reenactments did not rest on alternative, legitimate grounds, the government cannot point to these later iterations to meet its burden or obligate Mr. Gamez-Reyes to start his argument afresh. *Hunter*, 471 U.S. at 229, 232-33 (rejecting government's reliance on subsequent judicial narrowing of racially motivated disenfranchisement law, which did not indicate legislative intent to legitimate law); *Ramos v. Louisiana*, 140 S. Ct. 1390, 1401 n.44 (2020) (noting that where constitutionality of state's jury nonunamity rule depended in part on functional assessment of rule's benefits, court was required to examine racially discriminatory reasons for adoption of rule, and later reenactments following prior Supreme Court decision did not reflect legislative intent to act on alternative, legitimate grounds).

Second, when Congress modified and amended the illegal reentry statute in 1929 and 1952, Congress "use[d] criteria that arguably carried forward the effects of any discriminatory intent on the part of" the prior legislature. *See Abbott*, 138 S.Ct. at 2326. Because nativists in 1929 could not get agribusiness support to impose a quota to exclude Latinx migrants, they agreed on a criminal statute substitute so Latinx migrants

could enter to work and be removed after. The recodification in 1952 results in Congress defaulting to the same solution: because agribusiness interests will not agree to include Latinx migrants in the reenacted national origins quota, the illegal reentry statute is expanded to include those "found in" the United States, satisfying nativists and agribusiness alike. On that basis as well, the government cannot point to these iterations to meet its burden.

Third, even if the Court finds that a later recodification in 1952 or the five amendments in the eighties and nineties somehow broke the chain of discriminatory causation arising from the animus that led to the 1929 act, the record also conclusively demonstrates that the recodification and five amendments were each infected by discriminatory intent when independently analyzed. *Arlington Heights*, 429 U.S. at 270 & n.21; *Hunter*, 471 U.S. at 229, 232-33.

### A.   Section 1326 Disparately Impacts Latinxs.

*Arlington Heights* requires challengers to show that a law was enacted with a discriminatory purpose and disparately impacts a particular group. *See Arlington Heights,* 429 U.S. at 265-266. Disparate impact is established where the law's impact "'bears more heavily on one race than another.'" *Id*. at 266 (quoting *Davis*, 426 U.S. at 242). Here, § 1326 meets *Arlington Heights'* test because it disparately impacts one race, Latinxs. "Latin-Mexican nationals" comprised between 85 and 99 percent of defendants in unlawful reentry prosecutions under the Undesirable Aliens Act of 1929 and "the disparate impact upon Mexican and Latinos has not shifted" in the intervening decades, including after Congress enacted §1326. See *Machic-Xiap*, at *10. In the

fifteen years post-*Booker*,[3] 99.45 percent of defendants charged with at least one count of § 1326 were from Latin America, and 96.64 percent were Hispanic.[4] The impact remains as disparate as ever: over 99.11 percent of those convicted of illegal reentry in 2020 were considered Hispanic.[5] To make a showing of disparate impact, Mr. Gamez-Reyes only needs to show that §1326 "bears more heavily" on Latinxs, and the charging disparity is sufficient to do so, even without further comparison.

Nevertheless, geography does not blunt the impact. Whether the illegal reentry case was prosecuted in judicial districts at the Northern Border (94.9 percent Latin American) or the Southern Border (99.75 percent Latin American), Latinx defendants were disparately impacted. *Id.* at Tables 2, 3.

Nor does proportionality. According to Department of Homeland Security data, Mexicans, Hondurans, Salvadorans, Guatemalans, Colombians, Brazilians, and Venezuelans made up 66.9 percent of the unauthorized population in 2018, but they made up 97.67 percent of § 1326 prosecutions. *Id.* at Tables 5, 6. Conversely, Indians, Chinese and Filipinos made up 11.59 percent of the authorized immigrant population, but only .03 percent of § 1326 defendants. *Id.* That disparity is borne out across the dataset.

These disparities are comparable to disparities that have supported other successful *Arlington Heights* challenges. *See, e.g.*, *Ave. 6E Investments, LLC*, 818 F.3d at 497 (concentrating most low-income housing in neighborhoods that are 75 percent

---

[3] *United States v. Booker*, 543 U.S. 220 (2005).
[4] See Exhibit "S," Declaration of Lisa Tarasyuk at Table 1.
[5] U.S. Sentencing Commission, Quick Facts, Illegal Reentry Offenses (May 2021), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quickfacts/ Illegal_Reentry_FY20.pdf.

Hispanic); *Arce v. Douglas*, 793 F.3d 968, 978 (9th Cir. 2015) (targeting a program, 90 percent of whose enrollees were of Mexican or other Hispanic origin); *The Committee Concerning Community Improvement v. City of Modesto*, 583 F.3d 690, 704 (9th Cir. 2009) (excluding 71 percent Latino areas from benefits, while extending those benefits to other areas that were only 48 percent Latino). Moreover, in prior equal protection challenges to §1326, the government has not disputed the statute bears more heavily on Latinxs—and courts have found the statute disparately impacts Latinxs. *See Carrillo-Lopez*, at *6–7; *Machic-Xiap,* at *10.

### B. The 1929 Congress Acted With A Discriminatory Purpose When It Criminalized Reentry Under The Undesirable Aliens Act.

The reentry law which is codified today at § 1326 was originally enacted in 1929 as part of the Undesirable Aliens Act. Courts have held that racial animus was—at a minimum—a motivating factor in passing the Undesirable Aliens Act and its criminalization of reentry. *See Carrillo-Lopez*, at *9 ("the Act of 1929 was passed during a time when nativism and eugenics were widely accepted, both in the country at large and by Congress, and … these racist theories ultimately fueled the Act's passage"); *Machic-Xiap*, at *1 ("racism has permeated the official congressional debate over United States immigration laws since the late 19th and early 20th centuries, including the 1929 Act"). Even the government has "conceded that discriminatory intent motivated the passage of the Act of 1929." *Carrillo*-Lopez, at *7. The evidence of racial animus is so overwhelming that it is easy to see why.

Discerning the intent of a heterogenous Congress can be a tricky thing, but it is not always so. *Hunter*, 471 U.S. at 228. The Supreme Court's decision in *Hunter* has many parallels to the litigation before this Court, all of which support the conclusion that

§ 1326 violates Equal Protection. In *Hunter*, the Supreme Court affirmed the court of appeals' reliance on *Arlington Heights* and *Mt. Healthy* to hold that a provision of the Alabama Constitution which disenfranchised persons convicted of crimes involving moral turpitude violated the Equal Protection Clause. The Supreme Court found that although the provision was racially neutral on its face, its original enactment was motivated by a desire to discriminate against blacks on account of race, and it had a racially discriminatory impact from its adoption forward. *Hunter*, 471 U.S. at 233.

There, as here, the record included the testimony and opinions of historians, several historical studies, and records of legislative proceedings. *Id.* at 228-29 (noting that although there were no "eyewitnesses" to the 1901 proceedings, the district court received testimony and opinions of historians). In light of this record, while "[p]roving the motivation behind official action" may often be a "problematic undertaking," the Supreme Court in *Hunter* stated that such difficulties "do not obtain in this case." *Hunter*, 471 U.S. at 229. The Court concluded that the challenged statute "was enacted with the intent of disenfranchising blacks." *Id.* at 229.

In concluding that the law violated equal protection, the *Hunter* Court rejected the government's argument that the challenged provision had been motivated by both permissible and impermissible motives. *Id.* at 232. The Court also rejected the government's argument that subsequent judicial modifications to the statute over the preceding 80 years "had legitimated the provision," stating, "[w]ithout deciding whether § 182 would be valid if enacted today without any impermissible motivation, we simply observe that its original enactment was motivated by a desire to discriminate against

blacks on account of race and the section continues to this day to have that effect. As such, it violates equal protection under *Arlington Heights*." *Id*. at 232-33.

As in *Hunter*, while it may be difficult in some cases to discern the motives of legislators, it is not difficult here, where the challenged action took place during a movement toward tribalism and eugenics, and where the key congressmen were in no way secretive about their purpose that the entry and reentry provisions of the Undesirable Aliens Act of 1929 close a loophole in the 1924 National Origins Act that failed to set quotas to broadly exclude Latinx immigrants. The illegal reentry provision was a compromise brokered between nativist racists who wanted to keep Mexican people out of the country entirely, and agribusiness racists, looking to exploit the cheap labor of "docile" and "inferior" Mexicans and then have them deported at the end of harvest season so they could not intermix with whites or seek the benefits of permanent domicile.[6] Both groups demonstrated their antipathy for Latinx immigrants through racial slurs and negative stereotypes. Legislators referred to Mexicans as "mongrels" and "peons"[7] yet threw no such slurs at Canadians, who were also entering the country in record numbers at the time.[8] They claimed Mexicans were "poisoning the American citizen."[9] They sought to keep the country's blood "white and purely Caucasian."[10] They

---

[6] *See* Exhibit C, Declaration of Dr. S. Deborah Kang (hereinafter Kang Decl.) 2-4.

[7] Mae M. Ngai, *Impossible Subjects*, 23 (2004 William Chafe, et al.); Exhibit M, Representative Box (TX). "Deportation of Aliens." *Congressional Record*, (Feb. 16, 1929) p. H3619. *See* Deportation, Hearings Before the Committee on Immigration and Naturalization, House of Representatives, 69th Cong., Hearing 69.1.3 (1926) at 30; Exhibit G (Congressional Record, Feb. 16, 1929) at H3620.

[8] Exhibit G (Congressional Record, Feb. 16, 1929) at H3621 (stating that 81,506 Canadians entered the U.S. in 1928).

[9] Exhibit M, Representative FitzGerald, "Deportation of Aliens." *Congressional Record* (Feb. 6, 1929) p. H3620.

solicited reports and testimony from a eugenicist who likened immigration policy to the "breed[ing] of thoroughbred horses."[11] The totality of the circumstances demonstrate that, more likely than not, racial animus was a, if not *the,* motivating factor in the criminalization of reentry.

**1. Historical Background**.[12] The larger historical context ("the law's historical background") of growing Nativism and mainstream support for the Eugenics movement at the time the Undesirable Aliens Act was passed supports the conclusion that it was motivated by racial animus. Historians refer to the 1920s in the United States as the "Tribal Twenties." Following World War I, there was "a feverish sentiment against presumably disloyal 'hyphenated Americans.'"[13] Nativism and racial animus intensified, and the decade saw the rebirth of the Ku Klux Klan, the coming of age of Jim Crow, and the growing acceptance of eugenics.[14] The *Saturday Evening Post* ran articles warning that new immigrants were racially inferior, impossible to assimilate, and a threat to

---

[10] Exhibit H, Representative Lankford. "Across the Borders." *Congressional Record* (Feb. 3, 1928) p. H2462.

[11] Exhibit F, *The Eugenical Aspects of Deportation: Hearings before the Committee on Immigration and Naturalization House of Representative*, 70th Cong. 70.1.4 , p. 44 (1928).

[12] The Court need not analyze discriminatory intent using non-exhaustive considerations set forth in *Arlington Heights* when the totality of the circumstances so clearly reflects racial animus. Nevertheless, the considerations provide a helpful framework for organizing the wide range of relevant information, both broad and specific: from broad historical movements and moments ("historical background"), to the history of the challenged provision and containing legislation ("specific sequence of events leading to its enactment"), to the legislative history, including specific instances of procedural irregularity or illogical conclusions ("[d]epartures from normal procedural sequence or… substantive departures") adopted to advance a discriminatory end.

[13] Mae M. Ngai, *Impossible Subjects,* 19–20 (2004 William Chafe, et al.).

[14] Exhibit A, Declaration of Professor Lytle Hernández at 2.

stability and democracy.[15] The leader of a major scientific institution contended that neither education nor environment could alter the "'profound and inborn racial differences' that rendered certain people inferior."[16] Congress was not immune to the intellectual trends of the day.

### 2. The Specific Sequence of Events Leading Up To The Challenged Action.

The history of the Undesirable Aliens Act of 1929 in general and the reentry provision specifically ("the specific sequence of events leading up to the challenged decision") provides further evidence of Congress's discriminatory motive. Fears of "non-white" immigration spurred the introduction of numerous bills before the Undesirable Aliens Act of 1929,[17] as nativist politicians aimed to "restrict and even end immigration to the United States from every region of the world other than western Europe."[18] Congress began the decade by passing the first numerical restriction on immigration,[19] and for the rest of the decade legislators aimed for "America [to] cease to be the 'melting pot.'"[20] Prominent proponents of immigration restrictions "spoke increasingly of 'racial indigestion'" and "the 'contamination' of Anglo-American society.'"[21] Dr. Harry Laughlin, a leading eugenicist well-known for his model sterilization law (which would later serve as the template for Nazi Germany's sterilization law), testified before Congress many

---

[15] Jia Lynn Yang, *One Might and Irresistible Tide: The Epic Struggle Over American Immigration*, 8 (2020).

[16] Daniel Okrent, *The Guarded Gate: Bigotry, Eugenics, and the Law That Kept Two Generations of Jews, Italians, and Other European Immigrants Out of America*, 3 (2019).

[17] *See generally* Okrent, *supra.*

[18] Exhibit A, Declaration of Professor Lytle Hernández at 2.

[19] Emergency Immigration Act of 1921, Pub. L. No. 67-5, 42 Stat. 5 (1921).

[20] Yang, *supra*, at 3 (quoting Senator David A. Reed).

[21] Ngai, *supra*, at 23; Kelly Lytle Hernández, Migra! A History of the U.S. Border Patrol, 28 (2010).

times throughout the decade.[22] Relying on such racist theories, Congress would anchor its immigration laws in eugenics throughout the 1920s.[23]

Congress began focusing legislation around the exclusion of "undesirable" (i.e., non-white) immigrants.[24] The Wartime Measure Act of 1918 first vested authority in the President to restrict entry into the United States "contrary to the public safety."[25] The National Origins Act of 1924 then narrowed the pathways of legal immigration by establishing quotas based on national origin— with 96% of all quota slots reserved for European immigrants.[26] There was, however, one loophole that infuriated nativists: American industry (primarily agribusinesses in the southwest) successfully lobbied for the National Origins Act to exempt immigrants from the Western hemisphere in order to ensure continued access to cheap Mexican labor.[27] Nativists in Congress grumbled that the bill "leaves open the doors for perhaps the worst element that comes into the United States—the Mexican peon,"[28] and proposed numerous bills aimed at ending Mexican immigration.[29] The two major attempts came in 1926 and 1928, but "major employers and industries across the west" successfully opposed the bills due to "concern[] that they w[ould] be cut off from access to Mexican workers."[30]

---

[22] Ngai, *supra,* at 24; *Harry Laughlin and Eugenics*, Truman State University, available at https://historyofeugenics.truman.edu/.
[23] *See* E.P. Hutchinson, *Legislative History of American Immigration Law*, 1798-1965, at 212-13 (1981).
[24] *See Ave. 6E Investments, LLC v. City of Yuma, Ariz.,* 818 F.3d 493, 505–06 (9th Cir. 2016) ("the use of 'code words' may demonstrate discriminatory intent").
[25] Pub. L. No. 65-154, 40 Stat. 599 (1918).
[26] Exhibit A, Hernández Decl. at 3.
[27] Exhibit A, Hernández Decl. at 3; *see* Hans P. Vought, *The Bully Pulpit*, 179 (2004).
[28] Benjamin Gonzalez O'Brien, Chap. 1, *Handcuffs and Chain Link* (2018).
[29] Exhibit A, Hernández Decl. at 5.
[30] Exhibit D, Testimony of Professor Lytle Hernández at 28–30.

In the face of insurmountable industry opposition, nativists in Congress sought a compromise with industry: rather than preventing immigration, they would criminalize it after the fact. This compromise was the brainchild of Secretary of Labor James Davis and Senator Coleman Blease of South Carolina.[31] Davis was a believer in eugenics and warned about the "rat type" and "rat men" coming to the United States and jeopardizing the Anglo-American gene pool;[32] Senator Blease was a devout racist and suspected Klan member.[33] Secretary Davis was torn between his racist desire to protect the American gene pool and his responsibility to maintain a large labor supply for American industry—he reasoned this compromise would allow authorities to expel Mexicans after growing season, thereby avoiding industry resistance.[34] He was onto something, as one influential farmer and lobbyist explained to Congress: "We, in California, would greatly prefer some set up in which our peak labor demands might be met and upon the completion of our harvest these laborers returned to their country."[35] To bring their plan to fruition, Secretary Davis and Senator Blease collaborated with two powerful members of the House Immigration and Naturalization Committee: Representatives Albert Johnson of Washington and John Box of Texas. Johnson, the Chairman of the Committee, headed the Eugenics Research Association, which supported forced

---

[31] Ian MacDougall, *Behind the Criminal Immigration Law: Eugenics and White Supremacy*, ProPublica (June 19, 2020), available at https://www.propublica.org/article/behind-thecriminal-immigration-law-eugenics-and-white-supremacy.

[32] Vought, *supra,* at 174–79.

[33] See B. Simon, *The appeal of Cole Blease of South Carolina: Race, Class, and Sex in the New South*, The Journal of Southern History, 62:1, at 57–86 (Feb. 1996), available at http://www.jstor.com/stable/2211206.

[34] Vought, *supra*, at 216; MacDougall.

[35] Exhibit A, Declaration of Professor Lytle Hernandez at 7.

sterilizations.[36] He viewed the "fundamental reason" for immigration restrictions to be "biological," seeking to exclude the "Mexican race."[37] Box viewed the "Mexican peon" as "a mixture of Mediterranean-blooded Spanish peasant with low-grade Indians who did not fight to extinction but submitted and multiplied as serfs."[38] He saw Mexicans as "essentially different from us in character, in social position," and viewed the goal of immigration law as "the protection of American racial stock from further degradation or change through mongrelization."[39] Other legislators warned that Mexicans "composed of mixtured blood of White, Indian, and negro" were "pouring into our country, oftentimes at the behest of the various employers of large industrial enterprises," that "their blood" would be "a very great penalty upon the society which assimilates it," and that "their amalgamation with our people will cause a general weakening, physically and mentally, of our civilization."[40]

Allies of agribusiness were also motivated by racial animus to support the criminalization of reentry. They espoused the view that Latinx migrants "were mentally and morally inferior to European immigrants," "docile," "complacent," "birds of passage," and therefore the ideal "cheap, exploitable, and deportable labor force."[41]

**3. Legislative History**. The legislative history of the Undesirable Aliens Act further supports the conclusion that racial animus was a motivating factor in its enactment. Albert Johnson, the chairman of the House Immigration and Naturalization

---

[36] Dennis Wepman, *Immigration: From the Founding of Virginia to the Closing of Ellis Island*, at 242–43 (2002).
[37] Okrent, supra, at 3.
[38] Exhibit I (Congressional Record, Feb. 9, 1928) at H2817–18.
[39] Exhibit L (Congressional Record, Feb. 16, 1929) at H3619; Exhibit F (Congressional Record, Feb. 9, 1928) at H2817–18.
[40] Exhibit H (Congressional Record, Feb. 3, 1928) at H2462.

Committee, had previously convened hearings on immigration. At one hearing, he admitted into the record a letter from a constituent urging legislators to keep out "the scoff and scum, the mongrel, the bootlegger element from Mexico."[42] At another hearing, the principal witness was Dr. Laughlin (the prominent eugenicist).[43] Johnson praised Laughlin's report as a "priceless" resource that would "bear intimately on immigration policy."[44] Laughlin went on to testify about "protect[ing] American blood from alien contamination," and contended that "[i]mmigration control is the greatest instrument which the Federal Government can use in promoting race conservation of the Nation."[45] He compared the drafters of deportation laws to "successful breeders of thoroughbred horses" and advocated deportation of the "undesirable individual," because otherwise "we cannot get rid of his blood no matter how inferior it may be, because we cannot deport his offspring born here."[46] Finally, he predicted that so long as the border remained open to immigrants, "there will always be need for deportation, or the 'final selection.'"[47]

Chairman Johnson agreed that "[i]mmigration looks more and more like a biological problem, and if the work of this committee results in establishing this principle

---

[41] Exhibit C, Kang. Decl. at 3.

[42] Exhibit G (Deportation, Hearings Before the Committee on Immigration and Naturalization, House of Representatives, 69th Cong., Hearing 69.1.3 (1926)) at 30.

[43] Exhibit F, *The Eugenical Aspects of Deportation, Hearings before the Committee on Immigration and Naturalization*, House of Representatives, 70th Cong., Hearing No. 70.1.4 (1928)) at 1.

[44] *Id.* at 3.

[45] *Id.* at 3, 19.

[46] *Id.* at 44–45. This was not the only instance of comparing ethnicities to breeds of animals. Representative Patrick O'Sullivan criticized restrictions on Italian immigrants, stating that "the average Italian is as much superior to the average Mexican as a full-blooded Airedale is to a mongrel." Exhibit E (Congressional Record, Apr. 8, 1924) at H5900.

in our immigration policy we will be well repaid for our efforts."[48] He advocated for Congress's use of the "principle of applied eugenics" to "do everything possible" by "debarring and deporting" more people.[49] In this spirit of "applied eugenics," nativists in Congress set to work criminalizing reentry.

The compromise between nativists and agribusiness was formalized on January 18, 1929, when Senator Blease submitted a report to the full Senate recommending passage of a law that would penalize "aliens who have been expelled from the United States and who reenter the country unlawfully," along with a letter from Secretary Davis advocating passage of the law.[50] The Senate passed the bill.[51]

Two weeks later, Chairman Johnson submitted a report from the Committee of Immigration and Naturalization to the full House recommending passage of the law.[52] That report noted that "the hearings in the Sixty-ninth Congress on the subject matter contained in the bill were exhaustive," and "[m]uch important testimony was developed."[53] During the debate in the House, representatives made racist remarks, including that Mexicans were a "very undesirable" class that was "poisoning the American citizen."[54] The bill passed the House, and the president signed it into law three days later.[55]

---

[47] *Id.* at 44.
[48] *Id.* at 46.
[49] *Id.* at 25.
[50] Exhibit J (S. Rep. No. 1456, Jan. 17, 1929) at 1–2.
[51] Exhibit L at S2092.
[52] Exhibit L, H. Rep. No. 2397, Feb. 6, 1929.
[53] Exhibit L, S. Rep. No. 2397 (1929)) at 2.
[54] Exhibit M, Congressional Record, Feb. 16, 1929 at H3620.
[55] Exhibit N, Pub. L. No. 1018, Mar. 4, 1929.

Here, the numerous overtly racist statements from legislators demonstrate that Congress departed from normal procedures and substantive conclusions. *Arlington Heights*, 429 U.S. at 265-68. Certainly, if the purpose of the Act was to strengthen the country's borders, guard national security, or control the rate and flow of immigrants, it is counter-intuitive that the racial vitriol expressed during the debates was directed almost exclusively at one racial group, Mexicans, even though Canadians were also entering the United States in record numbers.[56] In fact, groups like the Immigration Restriction League had noted that because Canadians were of similar racial stock, no quotas were necessary.[57] Certainly, no legislator referred to Canadians as "mongrels" or complained that Canadians were "poisoning the American citizen."[58] "The omission of any real discussion of illegal entry from Canada from debate on the Undesirable Aliens Act made the racial animus behind the law clear."[59]

The greater historical context, the specific sequence of events leading to the reentry provision and the Undesirable Alien Act as a whole, the legislative history, including the numerous departures from rational conclusions, demonstrate that racial animus was a motivating factor in the passage of the Undesirable Alien Act and its reentry provision. As Professor Lytle Hernández testified, "the illegal reentry provision of the 1929 law was intended to target Latinos."[60] For this reason, Judge Du found that "racial animus was a strong motivating factor in the passage of the Act of 1929."

---

[56] Exhibit M, Congressional Record, Feb. 16, 1929 at H3621 (stating that 81,506 Canadians entered the U.S. in 1928).
[57] Exhibit B, Declaration of Benjamin Gonzales O'Brien 12.
[58] See Exhibit I, Deportation, Hearings Before the Committee on Immigration and Naturalization, House of Representatives, 69th Cong., Hearing 69.1.3 (1926))at 30; Exhibit G, Congressional Record, Feb. 16, 1929, at H3620.
[59] Exhibit B, Gonzales O'Brien Decl. at 12.

*Carrillo*-Lopez, 2021 WL 3667330 at *9; *see also Machic*-Xiap, 2021 WL 3362738 at *12 (characterizing the Undesirable Aliens Act as "serv[ing] two racist purposes"—it "furthered nativists' desire to separate certain immigrants from the general population by attaching criminal penalties like imprisonment" while at the same time giving "southwestern agribusiness greater ability to exploit these immigrants" by allowing farmers to use "the threat of deportation as leverage over this immigrant labor"). In short, Congress was motivated by racial animus when it enacted the Undesirable Alien Act and criminalized reentry and the burden now shifts to the government to show that the law would still have been enacted absent Congress's discriminatory purposes.

### C. Although The Reentry Statute Was Recodified In The McCarran-Walter Act Of 1952, The Recodification Did Not Break The Chain Of Discriminatory Causation.

When Congress consolidated the country's immigration laws in the McCarran-Walter Act of 1952, it renumbered the Undesirable Alien Act's criminalization of reentry to 8 U.S.C. § 1326. The 1952 Congress adopted the language from the Undesirable Alien Act "almost word for word," *Carrillo*-Lopez, 2021 WL 3667330 at *7, while other portions of the McCarran-Walter Act broadened the grounds for deportation and limited discretionary relief from deportation. The 1952 Congress did not debate or engage with the rationale for enacting a criminalization of reentry. "An exhaustive reading of the congressional debate indicates that Congress was deeply concerned with many facets of the Immigration and Nationality Act of June 27th, 1952, but sections 1325 and 1326 were not among the debated sections." *United States v. Ortiz-Martinez*, 557 F.2d 214, 216 (9th Cir. 1977). Instead, Congress simply shifted the unlawful reentry statute to a

---

[60] Exhibit E, Testimony of Professor Lytle Hernández at 34.

different section of the U.S. Code as part of the McCarran-Walter Act's consolidation of immigration laws, and tweaked the language to make it easier to prosecute that crime by expanding it to cover those "found in" the U.S., while continuing to protect employers and ensure border enforcement remained lax. A rose by any other name would smell as sweet – the government cannot avoid the equal protection mandate of the constitution by simply giving a statute enacted with discriminatory intent a brand new number.

"[A] prior version of a statute known to be motivated by racial animus may be considered as infecting its present iteration if it was not, in fact, substantially altered." *Carrillo-Lopez*, 2021 WL 3667330, at *10 (citing *Hunter*, 471 U.S. at 232-33, and *Abbott*, 138 S.Ct. at 2324-25, and noting that Supreme Court in *Abbott* distinguished its holding from *Hunter* because statute in *Abbott* was substantially different from predecessor and there was no evidence that reenacting legislature "carried forward the effects of any discriminatory intent"); *see also Hunter*, 471 U.S. at 229, 232-33 (in equal protection challenge to disenfranchisement law, examining original intent of 1901 legislature and rejecting government's reliance on subsequent judicial narrowing, which did not indicate legislative intent to legitimate law); *Ramos*, 140 S.Ct. at 1401 n.44 (stating that racially discriminatory reasons for state's initial adoption of jury nonunamity rule were relevant to constitutional analysis of rule's functional benefits under Sixth Amendment).

Additionally, when the legislature's reenactments do not reflect legislative intent to rely on alternative, legitimate grounds, the reviewing court should not grant judicial deference to the legislature's reenactment. *Compare Ramos*, 140 S.Ct. at 1401 n.44 (holding that original racist intent remained relevant notwithstanding recodification in new proceedings "untainted by racism"); *Abbott*, 138 S.Ct. at 2315, 2326 (indicating that

in redistricting context, "presumption of legislative good faith" would be unwarranted where "a law originally enacted with discriminatory intent is later reenacted by a different legislature").

Rather than granting judicial deference in that context, the court should instead find an unbroken chain of causation beginning with the racial animus that motivated the initial act, which is sufficient to meet the challenger's burden as to the reenactment. *See Ramos*, 140 S.Ct. at 1401 n.44; *Abbott*, 138 S.Ct. at 2326; *Mt. Healthy*, 429 U.S. at 286 (noting that burden-shifting based on evidence of unconstitutional motive is "a test of causation"). Because judicial deference should not be applicable with respect to the reenactment under these circumstances, the court should conclude that the evidence of racism with respect to the original act is sufficient to demonstrate that racial animus was a motivating factor with respect to both the original act, and the later reenactment, and should require the government to prove that the statute would have been enacted absent discriminatory intent.

With respect to § 1326, the Ninth Circuit has recognized in another context that the illegal reentry statute today should be interpreted through the lens of Congressional intent in 1929. In *United States v. Rizo-Rizo*, 16 F.4th 1292 (9th Cir. 2021), the Ninth Circuit looked to the Undesirable Aliens Act of 1929 when assessing the mens rea requirement in 8 U.S.C. § 1325, which criminalizes unauthorized entry (as opposed to reentry after deportation). The Ninth Circuit found it important that "the precursor statutes to both §1325(a) and §1326(a), which bear substantially similar language to the modern statutes, were enacted together in 1929 as part of" the Undesirable Aliens Act. *Id.* at 1298. Why? Because "when statutes are enacted shortly after one another and

address the same subject and use similar language, that demonstrates Congress's intent that they have the same meaning." *Id*. That is, the Ninth Circuit explicitly tied §1326 to its "precursor statute," the Undesirable Aliens Act, finding it was "Congress's intent that they have the same meaning." *Id*. It is therefore appropriate for this Court to construe §1326 by referring to its precursor statute, the Undesirable Aliens Act's unlawful reentry provision, and to find discriminatory intent.

Supreme Court case law reflects the understanding that questions of legislative intent with respect to a reenactment should normally be viewed through the lens of Congressional intent at the time of the original enactment: "It will not be inferred that the legislature, in revising and consolidating the laws, intended to change their policy, unless such intention be clearly expressed." *United States v. Ryder*, 110 U.S. 729, 740 (1884). "[W]e do not presume that the revision worked a change in the underlying substantive law unless an intent to make such a change is clearly expressed." *Keene Corp. v. United States*, 508 U.S. 200, 209 (1993) (cleaned up); *Georgia v. Rachel*, 384 U.S. 780, 802 (1966) (noting that although statute had been modified and renumbered, "[t]here is no suggestion that the modifications in the statute since 1874 were intended to effect any change in substance. Hence, for the purposes of the present case, we are dealing with the same statute that confronted the Court in the cases interpreting [predecessor statute]"); *see also Hunter*, 471 U.S. at 232–33; *Ramos*, 140 S. Ct. at 1410 (Sotomayor, J., concurring) (noting that "many laws and policies in this country have had some history of racial animus" and citing *United States v. Fordice*, 505 U.S. 717, 729 (1992) for the proposition that "policies that are 'traceable' to a State's *de jure*

racial segregation and that still 'have discriminatory effects' offend the Equal Protection Clause).

Because racial animus motivated the 1929 Congress to criminalize reentry under the Undesirable Aliens Act, and because the 1952 Congress simply recodified that law at § 1326, while expanding liability to criminalize the status of merely being "found in" the United States after deportation, there is no need for the Court to assess the McCarran-Walter Act under *Arlington Heights*. Instead, the Court should return to the 1929 statute and invite the government to meet its burden to establish that Congress would have enacted the criminalization of reentry law in 1929 even had the impermissible purpose not been considered. The lack of debate surrounding the reentry statute and almost word-for-word adoption of the language in the Undesirable Alien Act do nothing to break the chain of discriminatory causation and therefore, the government will be unable to meet its burden.

Two recent Supreme Court cases confirm that when the constitutionality of a law is questioned, any discriminatory purpose that fueled the law's original enactment remains relevant when that purpose is relevant to the constitutional analysis. In *Ramos*, the Court struck down a state law permitting convictions by non-unanimous juries as violative of the Sixth Amendment. *Ramos*, 140 S. Ct. at 1401. In striking down the law, the Court analyzed several factors, including the "functional benefits" of non-unanimity, which was relevant to the test for constitutionality. *Id*. On that factor, the Court carefully analyzed the "racially discriminatory reasons that Louisiana and Oregon adopted their peculiar rules in the first place." *Id*. Although Justice Alito argued in dissent that both states later recodified their non-unanimity rules with no mention of race, the majority

rejected the notion that this cured the laws' original animus, holding that in order to "assess the functional benefits" of a law, courts cannot "ignore the very functions those rules were adopted to serve." *Id*. at 1401 n.44. Nor could the justices' "shared respect for rational and civil discourse . . . supply an excuse for leaving an uncomfortable past unexamined." *Id*. (citation and quotations omitted).

Two months later, the Supreme Court struck down a Montana law prohibiting families from using state-sponsored scholarships at religious schools, which the Court found violative of the Free Exercise Clause. *See Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020). Here, the majority considered the law's "checkered tradition" of underlying religious discrimination, even though it had been reenacted in the 1970s "for reasons unrelated to anti-Catholic bigotry," because this history of discrimination was relevant to the state's interest in maintaining the prohibition. *Id*. at 2259. Concurring, Justice Alito provided an extensive history of the anti-Catholic and antiimmigrant motives underlying Montana's law, concluding that "[u]nder *Ramos*, it emphatically does not matter whether Montana readopted the no-aid provision for benign reasons. The provision's 'uncomfortable past' must still be 'examined.'" *Id*. at 2273 (quoting *Ramos*, 140 S. Ct., at 1396, n.44).[61]

Similarly, in the redistricting context, the Supreme Court in *Abbott* identified at least two circumstances in which a reviewing court may decline to apply a "presumption of legislative good faith" to a legislature's reenactment or modification of an existing

---

[61] Justice Alito noted that although he had taken the opposite position in his dissent in *Ramos*, "I lost, and *Ramos* is now precedent." *Id*. at 2268 (Alito, J., concurring).

statute. *Abbott*, 138 S. Ct. at 2326.[62] Those circumstances include, for example, the factual scenario presented in *Hunter*, or when "a law originally enacted with discriminatory intent is later reenacted by a different legislature," or when the legislature "use[d] criteria that arguably carried forward the effects of any discriminatory intent on the part of" the prior legislature. *Id.* at 2326.

In *Abbott*, the Supreme Court considered whether a 2013 Texas redistricting plan was entitled to a presumption of legislative good faith, when the Texas legislature had previously enacted a redistricting plan in 2011 that was challenged in court on grounds of racial discrimination, and never used. The *Abbott* Court found that the revised redistricting plan was entitled to a "presumption of legislative good faith" in light of the drafters' efforts to make substantive changes to the never-used, "defunct" prior plan, which they had modified pursuant to a directive from the Supreme Court itself "not to incorporate . . . any legal defects." *Abbott*, 138 S. Ct. at 2325, 2329.

The *Abbott* Court held that "under these circumstances," the intent of the 2013 legislature was "what matters," but still made clear that the legislature's original intent

---

[62] It should be noted that *Abbott* is distinguishable here to the extent that it involved a state redistricting plan, which the Supreme Court noted "is primarily the duty and responsibility of the State." *Abbott*, 138 S. Ct. at 2324 (citation omitted). As the Court emphasized, "federal-court review of districting legislation represents a serious intrusion on the most vital of local functions, and *in that context*, the good faith of the state legislature 'must be presumed.'" *Id.* (quoting *Miller v. Johnson*, 515 U.S. 900, 915–16 (1995) (emphasis added). Accordingly, to the extent *Abbott* suggests any kind of presumption of a legislature's good faith, such presumption should be limited to redistricting cases. *See Abbott*, 138 S. Ct. at 2324. Judge Du notes that both *Abbott* and *Miller* justify this presumption on the complexity of redistricting—and there is no reason to believe such a presumption would carry over to a less complex statutory scheme, particularly where it has been shown that the original legislation was motivated by racial animus and the reenacting legislation is nearly identical. *Carrillo-Lopez* at *10 n.21. Additionally, the concern regarding intrusion on "local functions" is absent when – as

remained relevant to determining the intent of the reenacting legislature "to the extent that [it] naturally give[s] rise to—or tend[s] to refute—inferences regarding the intent of the" reenacting legislature. *Id.* at 2327. On the facts presented, the Supreme Court stressed that the legislature "did not reenact the plan previously passed by its 2011 predecessor" and therefore had not "carried forward the effects of any discriminatory intent on the part of the 2011 Legislature." *Id.*[63]

At the same time, the Supreme Court in *Abbott* specifically limited its holding to the circumstances presented, noting,

> we do not confront a situation like the one in *Hunter*. Nor is this a case in which a law originally enacted with discriminatory intent is later reenacted by a different legislature. The 2013 Texas legislature did not reenact the plan previously passed by its 2011 predecessor. Nor did it use criteria that arguably carried forward the effects of any discriminatory intent on the part of the 2011 Legislature.

*Id.* at 2325.

With regard to § 1326, the 1952 Congress—unlike the legislature in *Abbott*—did not engage with the disparate impact or discriminatory purpose behind the original legislation. Rather, it recodified a racist law without debate, altering it only to make it easier to achieve its discriminatory purpose, and knowingly "carried forward the effects"

---

here – a federal court performs its constitutional duty to assess whether a federal statute complies with the Due Process Clause.

[63] In that context, the Court stated that past discrimination does not, "in the manner of original sin," condemn future governmental action that is not itself unlawful. *Abbott*, 138 S.Ct. at 2324 (citing *Mobile v. Bolden*, 466 U.S. 55, 74 (1980)). Both *Abbott* and *Mobile*, however, are distinguishable on this point, because both cases involved the voting context, and neither case involve a reenacted statute that was motivated by racial animus. *See Mobile*, 466 U.S. at 74 ("the District Court and the Court of Appeals supported their conclusion by drawing upon the substantial history of official racial discrimination in Alabama. But past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful. The ultimate question remains

of the Act's discriminatory intent. *Abbott* does not shield reenacting legislation from scrutiny where the legislature passes a nearly identical law, without taking any steps to break the chain of causation arising from the prior legislature's racial motivation, such as acknowledging or addressing the prior legislation's discriminatory motive or disparate effect. When Congress carries forward legislation that was motivated by racial animus and has produced racially disparate results (and, as set forth below, does so with ample evidence of the same discriminatory intent that motivated the original law), it takes no mental gymnastics to find that no intervening event broke the chain of discriminatory causation.

Here, the original illegal reentry law codified in the Undesirable Aliens Act of 1929 has been reenacted several times, most notably in 1952. But *Ramos* and *Espinoza* confirm that courts must examine the racial motivations of a law at the time of its passage in cases where those motivations are relevant to the law's constitutionality. The 1952 Congress's recodification of the Undesirable Aliens Act's unlawful reentry statute—without debate on (and with full knowledge of) the statute's discriminatory intent and disparate impact—establishes discriminatory intent under *Arlington Heights*.

Commentators have also explained why, in the Equal Protection context, the original legislature's racial animus should normally govern interpretation of any reenactments. *See* Frampton, Thomas, *The Jim Crow Jury*, 71 Vand. L. Rev. 1593 (2018) (cited in *Ramos*, 140 S.Ct. at 1394 n.4). In *The Jim Crow Jury*, Professor Thomas Frampton argued that jury nonunanimity laws should be struck down under the

whether a discriminatory intent has been proved in a given case. More distant instances of official discrimination in other cases are of limited help in resolving that question.").

Equal Protection Clause, relying in part on *Arlington Heights* and *Hunter*.[64] *Id*. at 1651-52. Professor Frampton anticipated Justice Alito's dissenting argument in *Ramos*, specifically, that original intent was not relevant because subsequent constitutional conventions had readopted the measure. *Id.* at 1651-52 n.283. In response, Professor Frampton noted that the Supreme Court had already rejected a variation of that argument in *Hunter*, and cited *United States v. Fordice*, which held:

> [A] State does not discharge its constitutional obligations until it eradicates policies and practices traceable to its prior *de jure* dual system that continue to foster segregation. Thus, we have consistently asked whether existing racial identifiability is attributable to the State and examined a wide range of factors to determine whether the State has perpetuated its formerly *de jure* segregation in any facet of its institutional system.

505 U.S. at 728. As previously noted, Justice Sotomayor specifically cited this aspect of *Fordice* in her concurrence in *Ramos*. 140 S. Ct. at 1410 (Sotomayor, J., concurring) (citing *Fordice* and noting that "[w]here a law otherwise is untethered to racial bias—and perhaps also where a legislature actually confronts a law's tawdry past in reenacting it— the new law may well be free of discriminatory taint. That cannot be said of the laws at issue here.").

Applying that logic here, although *Fordice* involved *de jure* segregation, the racial animus underlying § 1326 is so apparent that it should be appropriate to consider this nation's approach to illegal reentry as a form of *de jure* segregation. Indeed, the district court in *Machic-Xiap* provided a detailed summary of this tragic history of purposeful

---

[64] While the Court in *Ramos* ultimately struck down jury nonunamity rules under the Sixth Amendment, the *Ramos* Court appears to have found Professor Frampton's extensive research regarding the racial animus behind jury nonunanimity rules to be highly persuasive. *Compare Jim Crow Jury* at 1599-1620 *with Ramos*, 140 S.Ct. at 1394, 1401 & n.44.

discrimination, and specifically addressed the combined intent of the quota system and the illegal reentry law in 1929 as follows:

> [C]ongressmen were decrying the threat posed by immigration from Latin America. One representative urged Congress to "see what grave problems have been injected into our national life by the importation for labor purposes of great numbers of [Mexican] people essentially different from us in character, in social position, and otherwise." Another argued that "[Mexican] immigrants are poisoning the American citizen." Still another complained that their "blood [is] a very great penalty upon the society which assimilates it," because it is "composed of mixture blood of white, Indian, and negro."

> Increased deportations of immigrants from south of the border also altered southwestern agribusiness' calculations. Farmers quickly realized that the threat of deportation was a strong bargaining tool that they could use for their benefit. South Carolina Senator Coleman Livingston Blease saw an opportunity for compromise: Congress would not impose a quota on immigrants from Mexico or Central America, but criminalize the act of illegally reentering the United States after deportation. Thus, Farmers retained their labor force and gained "the threat of imprisonment in ... negotiations" with undocumented laborers. Congressmen who feared that persons from Latin America imperiled the nation's blood purity, meanwhile, gained a legal way to separate them from rest of the population. Of course, fear of blood contamination or desire for economic exploitation was not the only reason for enacting the 1929 Act.

> The 1929 Act also solidified perceptions of persons from Latin America as a separate, unwelcomed race. In the 1930 Census, Mexicans were no longer categorized as white, but as a distinct race. Throughout the 1930s and early 1940s, "Mexican workers in the Southwest and California were racialized as a foreign people, an 'alien race' not legitimately present or intended for inclusion in the polity." Moreover, "[d]uring the 1930s, ... between 85 percent and 99 percent of the people who are in prison [for unlawful reentry] are Latin Mexican nationals." The perception of persons from Latin America as "the illegal" "deepen[ed] after the passage [of the 1929 Act]."

*Machic-Xiap*, at \*6-7 (footnotes omitted).

Considering § 1326 in its larger context provides further reason to conclude that the reenactments must be viewed through the lens of the legislature's original intent, and cannot meet the government's burden under *Arlington Heights* to show that the

illegal reentry statute would have been passed without discriminatory animus. *Compare Fordice*, 505 U.S. at 728 (holding that State has obligation under Equal Protection Clause to eliminate remnants of *de jure* segregation, and cannot discharge its burden by relying on facially neutral reenactments where there are still constitutionally suspect features).

### D.  There Is Ample Evidence That Discriminatory Intent Also Motivated the McCarran-Walter Act.

The 1952 Congress recodified the unlawful reentry statute not in spite of the 1929 Congress's racism, but also due to its own racial animus. Applying *Arlington Heights* to the 1952 recodification of §1326, it is clear racial animus was also a motivating factor in its passage.

**1. Historical Background**. The anti-Latinx racism that motivated Congress in 1929 did not dissipate over the years leading up to the passage of the INA in 1952. White supremacy was alive and well throughout this time. Schools were segregated, *see, e.g.*, *Westminster Sch. Dist. Of Orange Cty. v. Mendez*, 161 F.2d 774, 781 (9th Cir. 1947) (holding that the "segregation of school children of Mexican descent" violated the Fourteenth Amendment), and anti-miscegenation laws were on the books in numerous states, *see Loving v. Virginia*, 388 U.S. 1, 7 (1967) (noting a state court had, in 1955, upheld an anti-miscegenation law as "an endorsement of the doctrine of White Supremacy" and an attempt to prevent "a mongrel breed of citizens"). Between 1929 and 1952, there were two major historical events bearing on the Latinx population: the "repatriation drives" of the Great Depression and the subsequent "Bracero Program." Both events demonstrate the United States' intent to preserve the white racial majority

and purity, by preventing Latinx migrants' permanent settlement and by exerting control over a temporary and exploitable Latinx workforce.

During the Great Depression, an estimated 400,000 to over 1 million Mexicans and Mexican Americans were coerced and threatened into leaving the United States in informal raids of Mexican-American communities known as "repatriation drives." *Sixty percent* of them were U.S. citizens. As Professor Gonzalez O'Brien testified, "this was a campaign that was meant to fuel voluntary repatronization … driven by a sense of the threat of deportation or the threat of additional penalties if those individuals did not return to Mexico."[65] The campaign achieved its purpose, driving millions of Latinxs— many, if not most, of whom were U.S. citizens—out of the United States. California has since apologized to the "estimated two million people of Mexican ancestry [who] were forcibly relocated to Mexico, approximately 1.2 million of whom had been born in the United States."[66]

Not long after this mass exile of Latinx people, the United States entered World War II, finding itself again in need of cheap labor. In 1942, the United States started the Mexican Farm Labor Program, also known as "Operation Bracero" or the "Bracero Program." The idea was to funnel Latinx labor into the United States on a legal and temporary basis, while ensuring decent wages and humane treatment for the laborers. But the reality was that Braceros were lured to the United States only to be brutalized. They were subjected to medical inspections that required them to strip naked and

---

[65] Exhibit D, Testimony of Professor Gonzalez O'Brien at 87.
[66] California Apology Act for the 1930s Mexican Repatriation Program (effective January 1, 2006), available at https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=200520060SB670.

involved invasive inspections and "being gassed systematically with DDT."[67] The protections they were promised were routinely ignored.[68] They were exploited and subjected to literally backbreaking labor precisely because of their race. As Professor Lytle Hernández testified, the Braceros were mistreated because of the stereotype "that they, as a racial group, um, were more stout and close to the ground and sort of fit for this kind of labor, and so they didn't need the accoutrement that others did." *Id.* When they were no longer needed, they were sent or deported back to Mexico, and the illegal reentry statute was used as a threat to ensure their submission to their own exploitation.[69] "[T]he immigration enforcement policies of the Bracero era powerfully reinforced longstanding racist notions that Mexican migrants deserved admission into the United States not as prospective citizens but instead as a cheap, exploitable, and deportable force."[70] Both the "repatriation drives" of the Great Depression and the subsequent "Bracero Program" demonstrate that anti-Latinx racism remained prevalent in the years leading up to the passage of the INA in 1952.

**2. Sequence of Events Leading Up To The Challenged Action**. The historical events directly surrounding passage of the McCarran-Walter Act ("the specific sequence of events leading up to the challenged decision"), especially the 1952 Congress's debate and passage of the "Wetback Bill," which included regular use of the racial slur "wetback," just two months before its passage of the McCarran-Walter Act, similarly reveal Congress's discriminatory intent. Moreover, Congress's continued rejection of law enforcement requests for border enforcement funding and refusal to impose

---

[67] Exhibit D, Testimony of Professor Lytle Hernández at 76–77.
[68] Exhibit D, Testimony of Professor Lytle Hernández at 78.
[69] Exhibit D, Testimony of Professor Lytle Hernandez at 60.

penalties for employers of undocumented immigrants, are substantive irregularities that undermine any assertion that the true purpose of 1326 was to secure the border or prevent illegal immigration.

Congress passed Senate Bill 1851 (the so-called "Wetback Bill") two months before the same Congress passed the McCarran-Walter Act. The Wetback Bill's passage is particularly probative for two reasons: first, it was passed by the same Congress that, just two months later, would recodify the unlawful reentry provision of the Undesirable Aliens Act; and second, it shared the aim of preventing unlawful immigration (its stated purpose was to "assist in preventing aliens from entering or remaining in the United States illegally.").[71] The 1952 Congress's debate and passage of the Wetback Bill is relevant historical background demonstrating the open racism of the legislature that would enact §1326 only two months later. As Professor Gonzalez O'Brien testified, "throughout the debate [on the bill], Mexican undocumented entrants [were] regularly referenced as wetbacks," the debate focused on the "wetback problem," and legislators suggested that individuals "may be criminals because they are wetbacks."[72] The fact that the 1952 Congress openly used the racial slur "wetback" to refer to Mexicans—while debating the "Wetback Bill"—is illustrative of the open racial animus of the 1952 Congress.

Professor Gonzalez O'Brien testified that the "term 'wetback' is one that is racially derogatory, was recognized as being racially derogatory at the time," and "across the period of the 1940s and 1950s [was] associated … almost synonymous with

---

[70] Exhibit C, Kang Decl. at 11.
[71] Pub. L. No. 82-283, 66 Stat. 26 (1952).
[72] Exhibit D, Testimony of Professor Gonzalez O'Brien at 97–98, 107.

Mexicans."[73] "[W]hile the use of racial slurs, epithets, or other derogatory language does not alone prove discriminatory intent, it is evidence that official action may be motivated by such an unlawful purpose." *La Union del Pueblo Entero v. Ross*, 353 F. Supp.3d 381, 395 (D. Md. 2018). As Judge Du found in *Carrillo-Lopez*, the use of the term "wetback" "evidences the racial environment and rhetoric in 1952, even among high-ranking government officials and committees, specifically with regard to Mexican and Latinx people." *Id*. at *13.

Congress's passage of the "Wetback Bill" also represents an illogical and counter-intuitive substantive irregularity leading up to the enactment of §1326. This is because of the incongruity between the stated intent of the "Wetback Bill" and Congress's actual intent, as demonstrated by the language of the statute. While the bill's stated aim was to prevent "aliens from entering or remaining in the United States illegally," the law safeguarded the interests of agribusiness by shielding employers from prosecution ("for the purposes of this section, employment … shall not constitute harboring"), directly conflicting with its stated goal.[74] The 1952 Congress, despite its avowed interest in limiting unlawful immigration, was in fact furthering the racist compromise introduced by the 1929 Congress: preserving American industry's access to cheap and exploitable Latinx labor while punishing the Latinx migrants who provided that labor. As Judge Du found in *Carrillo-Lopez*, the 1952 Congress's "criminalization of Mexican immigrant laborers while shielding employers evidences the racially discriminatory motives and intent of the same Congress who enacted Section 1326 only two months later." *Id*. at *15.

---

[73] Exhibit D, Testimony of Professor Gonzalez O'Brien at 89.

Similarly, Congress rejected the INS's proposal for employer penalties to deter unlawful immigration. As Dr. Kang establishes, the INS proposed such sanctions, and the Truman administration published that recommendation in a 1951 report explaining that "American growers created the conditions that drew undocumented works to the United States in the first place"—and that it was those American growers "rather than the migrants themselves, [who] bear the principal responsibility for the so-called crisis on the border."[75] But, "[a]s in the 1920s, racist conceptions of Mexican migrants as the ideal agricultural workforce led congressional conservatives to ... reject efficacious employer penalty proposals."[76] These irregularities further demonstrate that it was racial animus—not a race-neutral desire to prevent unlawful immigration—that motivated Congress's recodification of the unlawful reentry statute at §1326. If Congress's true aim was preventing unlawful immigration, it was illogical and counter-intuitive for it to cut the border enforcement budget and to refuse to sanction employers who hired undocumented immigrants.

As Judge Du found in *Carrillo-Lopez,* this sequence of events demonstrates that "[t]he 1952 Congress's silence does not evince a neutral viewpoint, but worked to expand the enforceability of an admittedly racist law." *Id.* at *14.

**3. Legislative History**. Four portions of the legislative history of the McCarran-Walter Act highlight Congress's discriminatory intent in recodifying § 1326: (1) the ways in which Patrick McCarran and Francis Walter exerted their considerable influence over

---

[74] Pub. L. No. 82-283, 66 Stat. 26 (1952).

[75] Exhibit C, Kang Decl. at 14.

[76] Exhibit C, Kang Decl. at 13. These efforts were led by Senator Allen Ellender of Louisiana, the son of Louisiana plantation owners, a lifelong segregationist and civil rights opponent, and an ally of agribusiness. *See* Kang Decl. at 15–16.

the legislative process and other congressmen to achieve their racist aims in relation to the Act; (2) the fact that the Act preserved the quota system but also continued Western Hemisphere immigration quota-free, necessitating § 1326 to prevent Latinx migrants from settling permanently in the United States; (3) the fact that Congress overrode President Truman's veto, in spite of his explicit criticism of the racism contained in the Act; and (4) that the one and only substantive change to the §1326 statute was generated in response to a letter providing the views of the Department of Justice that included the racial slur "wetback."

The sponsors of the McCarran-Walter Act were racists who exerted their considerable power to enact a law that disproportionately favored white, Western European immigrants. Senator McCarran, chair of the Senate Judiciary Committee, of which Immigration is a subcommittee, was a racist and anti-Semite.[77] He described the threat of immigration as one of the United States being "overrun, perverted, contaminated, or destroyed."[78] He used the racial slur "wetback" repeatedly, including in Senate committee hearings in 1951 and 1953.[79] Francis Walter was the head of the House Judiciary Subcommittee on Immigration, and had ties to eugenics. In the 1950s and 1960s, Rep. Walter served as a committee member on a committee that awarded

---

[77] *See* Exhibit C, Kang Decl. at 18–19 n.54. *See also* Exhibit O, Letter from Senators Jacky Rosen and Catherine Cortez Masto and Representatives Steven Horsford, Dina Titus, and Susie Lee, dated June 19, 2020), describing Senator McCarran's "dark legacy of virulent racism, anti-Semitism, and xenophobia," describing him as "a man who advocated bigotry," and requesting that his statue be removed from the National Statuary Hall Collection.
[78] Exhibit O, Letter from Senators.
[79] Exhibit C, Kang Decl., 17-19.

grants for genetics research funded by a noted eugenicist.[80] [81] Even the State Department agrees that Senator McCarran and Representative Walter were motivated to secure passage of the McCarran-Walter Act by concern "that unassimilated aliens could threaten the foundations of American life."[82] Their racial animus was evident in the strategies they employed in connection with the Act. For instance, in order to skew the already racist quota system further in favor of Western Europeans, Walter and McCarran insisted on using the 1920 census numbers to set the quotas, rather than using recent census data, which would result in more diverse admissions.[83] By using 1920 numbers, they were able to engineer unfairly high quotas for northwestern Europe and unfairly low numbers for southeastern Europe and the rest of the world.[84]

As the chair of the Senate Judiciary Committee,[85] Senator McCarran had a considerable amount of influence over the legislative process.[86] In July 1952, one

---

[80] Lichtenstein, Grace, *Fund Backs Controversial Study of 'Racial Betterment',* N.Y.T. (Dec. 11, 1977), available at: https://www.nytimes.com/1977/12/11/archives/fund-backs-controversial-studyof-racial-betterment-some-others-who.html. (The committee was financed by Wickliffe Draper, founder of the Pioneer Fund, an organization whose original mandate was to pursue "race betterment" by promoting the genetic stock of those "deemed to be descended predominantly from white persons who settled in the original thirteen states prior to the adoption of the Constitution." *See* fn. 52).

[81] Southern Poverty Law Fund, Pioneer Fund, https://www.splcenter.org/fighting-hate/extremistfiles/group/pioneer-fund (last accessed Jan. 21, 2022).

[82] U.S. Dep't of State, Office of the Historian, *The Immigration and Nationality Act of 1952 (The McCarran-Walter Act),* https://bit.ly/32d4Y6B.

[83] Bennett, Marion T. "*The Immigration and Nationality (McCarran-Walter) Act of 1952, as Amended to 1965,*" *Annals of the American Academy of Political and Social Science,* "The New Immigration" 367 (1966): 129.

[84] *Id.*

[85] Exhibit C, Kang Decl. at 16.

[86] "A committee's influence may extend throughout the legislative process to the enactment of bills into law. A committee member, often the chair, will play an important role in managing the full Senate's deliberation on the bill. Also, committee members will be appointed as conferees to reconcile the Senate version of a bill with the version passed by the House of Representatives." United States Senate, *About the Senate*

month after the passage of the McCarran-Walter Act, the *Washington Post* declared in an article: "It sums the character of this congress to state an unquestionable fact: that its most important member was Patrick A. McCarran."[87] McCarran wielded that influence to delay and block the passage of any liberal immigration reforms.[88] [89] For instance, in order to push through the McCarran-Walter Act, Senator McCarran chose to deviate from procedural norms by rarely making himself available to debate the merits of his bill, and if he did, he obstructed the process by "refusing to yield to questions or simply repeat[ing] his own points in answer to a question."[90]

McCarran's influence on the rest of Congress was obvious: his racist comments on the national origins quota system made on the Senate floor were turned nearly verbatim into the Senate Judiciary Committee's Report and recommendation. Leading the defense of the quota system, McCarran stated on the floor of the Senate, "the national origins quota formula was a rational and logical method of numerically restricting immigration in such a manner as to best preserve the sociological and cultural balance in the population of the United States."[91] His opinion made it directly into the Senate Judiciary Committee Report. Five years of Congressional study preceded the 1952 Act, and this study culminated in the Senate Judiciary Committee

---

*Committee                                  System*,                        available                        at https://www.senate.gov/general/common/generic/about_committees.htm (last accessed Jan. 23, 2022).
[87] Johnson, Robert David, *Congress and the Cold War*, Cambridge University Press (November 21, 2005) at 55; citing *Washington Post*, Jul. 10, 1952.
[88] As Dr. Kang notes, McCarran characterized his role as chairman of the Judiciary Committee as follows, "[t]he chairman of a committee or a subcommittee cannot always assure passage of a bill which has been referred to his group, but can almost always kill the bill if he wishes to do so." Kang Decl., fn. 56.
[89] *Id.* citing to S. Rept. 1515, pp. 442-445; 455, 81st Cong, 2d Sess. (1950).
[90] Exhibit C, Kang Decl. at 19; fn. 59.

Report, a 900-page document which strongly supported the perpetuation of the national origins quota system originated in 1924.[92] Directly echoing Senator McCarran, it recommended: "the national origins system represented 'the will of Congress to preserve the racial composition of the United States through the selection of immigrants from those countries whose traditions, languages, and political systems were akin to those of this country… There is no doubt that it favored the peoples of the countries of northern and western Europe over those of southern and eastern Europe, but the subcommittee holds that the peoples who had made the greatest contribution to the development of this country were fully justified in determining that the country was no longer a field for further colonization and, henceforth, further immigration would not only be restricted but directed to admit immigrants considered to be more readily assimilable because of the similarity of their cultural background to those of the principal components of our population.'"[93] The McCarran-Walter Act was "Congress's response to the 'massive, nine-hundred page [Senate Judiciary] report that identified problems with current U.S. immigration policy and laid out recommendations for how best to address them.'" *Machic-Xiap*, at *7, internal citation omitted. Those recommendations that so influenced Congress came straight from the mouth of Patrick McCarran. This demonstrates both the power to influence wielded by Senator McCarran and the widespread Congressional adoption of his stated discriminatory purpose, to maintain the white racial majority.

---

[91] Exhibit C, Kang Decl. at 18, 99 Cong. Rec.1517-18 (March 2, 1953).
[92] Bennett, Marion T., *supra,* at 128-130.
[93] Bennett, Marion T., *supra,* at 129.

The concerns of nativists like McCarran (as evidenced by McCarran's stated intent to preserve the white majority of the United States) and agribusiness (as evident from their use of illegal reentry to force subservience from workers in the Bracero program and outside of it) were unchanged between the 1920s and 1952. Joined by such allies as Senator James Eastland,[94] a strident segregationist and cotton planter, whose family employed many undocumented Latinx migrants, they were a powerful coalition. Even congressmembers inclined to oppose the racist aspects of the McCarran-Walter Act knew that arguing against the racism underlying that provision would be ineffective because McCarran and Walter, by virtue of their positions and many allies, could and would block any attempt to alter their bill. Ultimately, "[t]hose congressmen who were most likely to attack the racist premises of the nation's immigration laws admitted that such a challenge would fail due to the pervasive racism among their fellow members in Congress and the institutional advantage wielded by the nativists and segregationists."[95] Or, as Representative Emanuel Celler of New York put it, "I knew that a really liberal immigration bill … had no more chance of being enacted this session than could a bit of butter remain intact on a hot stove."[96]

---

[94] Exhibit C, Kang Decl. at 19-20, fn. 60. "Eastland himself hired both legal and undocumented Mexican workers and worked directly with the INS to obtain those workers. Thus, for example, INS records reveal that in 1948, an Eastland staffer contacted A. R. Mackey to follow up on a promise that "he would get 50 Mexican laborers from Monterey." In lieu of these legally contracted workers, however, Eastland's office indicated that the Senator could procure "50 'wetbacks'" from his uncle who had a ranch in Texas. A.R. Mackey, Memorandum of telephone call between A. R. Mackey and Mr. Payce, Staff Member for Senator Eastland of Mississippi, September 16, 1948, 1:50p.m., file 56246/339B, RG 85, National Archives."

[95] Exhibit C, Kang Decl. at 23.

[96] Exhibit C, Kang Decl. at 20.

Second, for the same reasons that the national origins quota system was untouchable in 1952, §1326 was equally untouchable. To appease agribusiness racists like Eastland, the McCarran-Walter Act limited the quota system to immigrants from the Eastern Hemisphere, preserving the Western Hemisphere exception in the National Origins Act.[97] Without the entry and reentry provisions, there would be no mechanism to remove Latinx workers who had outstayed their usefulness, creating a threat to the white majority in America. McCarran, Walter, and their allies, would never allow such a thing to occur.

Third, 1952 Congress's racial animus is further demonstrated by its overriding of President Truman's veto of the McCarran-Walter Act, which explicitly criticized the racism of the Act. On June 25, 1952, President Truman vetoed the McCarran-Walter Act and issued a veto statement.[98] He condemned the INA as "legislation which would perpetuate injustices of long standing" and "intensify the repressive and inhumane aspects of our immigration procedures."[99] He expressed dismay that so much of the INA "would continue, practically without change" discriminatory immigration laws.[100] He admonished that it was "the time to shake off this dead weight of past mistakes … time to develop a decent policy of immigration … and a true reflection of the ideals we stand for, at home and abroad."[101] Two days after President Truman's statement, Congress overrode the veto and passed the INA. Congress's passage of the INA over a presidential veto explicitly calling out the law for its racism is evidence of racial animus.

---

[97] Bennett, Marion T., *supra,* at 127.
[98] Exhibit R (President Truman's statement on "Veto of Bill to Revise the Laws Relating to Immigration, Naturalization, and Nationality," June 25, 1952).
[99] *Id*. at 3.
[100] *Id*. at 4.

As Judge Du found in *Carrillo-Lopez*, "Congress' failure to heed President Truman's call to 'reimagine' immigration while simultaneously making the INA, and particularly Section 1326, more punitive in nature, is evidence of at least indifference to the nativist motivations of the statute's predecessor." *Id*. at *12.

The fourth way in which the legislative history reflects congressional discriminatory intent is that the one and only substantive change to the §1326 statute was generated in response to a letter providing the views of the Department of Justice that included the racial slur "wetback." Deputy Attorney General Peyton Ford wrote to the Chairman of the Committee on the Judiciary on behalf of the Department of Justice, included the racial slur "wetback," and requested the one and only substantive change to the statute— the expansion of the law to cover those "found in" the United States.[102] As the letter makes clear, this change was expressly designed to make it easier for the government to establish venue in criminal prosecutions.[103] Deputy Attorney General Ford was not some fringe figure shooting off a letter to his representative. He was the second-highest-ranking Department of Justice official and was providing "the views of the Department of Justice."[104] Based on his request alone (the congressional record does not appear to contain any other comment on what is now §1326), the 1952 Congress expanded the unlawful reentry statute so that venue would lie wherever a

---

[101] *Id*. at 6.
[102] Exhibit P (Statement of Peyton Ford, Deputy Attorney General, May 14, 1951).
[103] Exhibit P at 6 ("This change would overcome the inadequacies in existing law which have been observed in those cases in which it is not possible for the Immigration and Naturalization Service to establish the place of reentry, and hence the proper venue, arising in prosecutions against a deported alien under the 1929 act.").
[104] Exhibit P at 1.

reentering immigrant was found. But for this expansion, the government would have no grounds to prosecute Mr. Gamez-Reyes in this district.

Based on the record before the Court in *Carrillo-Lopez*, Judge Du was correct to find "the totality of the evidence shows that the same factors motivating the passage of [the unlawful reentry statute] in 1929 were present in 1952"—meaning, "racial animus was at least one motivating factor behind the enactment of Section 1326." 2021 WL 3667330 at *10, 16. This Court has even more information than Judge Du had before her, and should come to the same result.

### E. Amendments To § 1326 Did Not Break The Chain Of Discriminatory Causation.

The Anti-Drug Abuse Act of 1988 amended §1326 by adding subsection (b) which created increased penalties for those with prior felony convictions.[105] The new § 1326(b) provided that a person with a prior felony conviction who reenters may be imprisoned up to five years, and a person with an aggravated felony conviction may be imprisoned up to 15 years. *Id.* The Immigration Act of 1990 removed the $1,000 cap and authorized greater fines under Title 18.[106] In 1994, the VCCLEA increased penalties for violating § 1326 by including defendants with misdemeanor convictions in the heightened penalty category, markedly increasing imprisonment time for defendants with a prior felony, aggravated felony, or with three or more specified misdemeanors.[107] The amendment also broadened the definition of 'deportation' to include "any agreement in which an alien stipulates to deportation during a criminal trial under either

---

[105] *See* Pub. L. 100-690, title VII § 7345(a), 102 Stat. 4471 (Nov. 18, 1988) (codified at 8 U.S.C. § 1326 (1988)).
[106] *See* Pub. L. 101-649, title V § 543(b)(3), 104 Stat. 5059 (Nov. 29, 1990).

Federal or State law." *Id*. In 1996, AEDPA again amended § 1326 by mandating incarceration for any person who reenters after they were deported by judicial order, and limiting collateral attack of the underlying deportation order.[108] The AEDPA amendments also imposed a new, 10-year mandatory consecutive sentence for persons excluded from entry for spies and suspected saboteurs. *Id*. Finally, also in 1996, IRIRA added a penalty for persons convicted of nonviolent offenses who had been removed while on parole, supervised release, or probation, who then reenter.[109]

Because the unlawful reentry statute of 1929 was enacted with discriminatory intent and disparately impacts Latinxs, these amendments are only relevant to the Court's analysis if they create a break in the chain of discriminatory causation. They don't; rather building on the racial animus present in the Undesirable Aliens Act and the McCarren-Walter Act.

Judge Du was correct to hold that §1326's amendments "never substantively altered the original provision," "did not change the operation of § 1326," and "do not reflect any change of Congressional intent, policy, or reasoning, but merely work to increase § 1326's deterrent value." *Carrillo-Lopez*, 2021 WL 3667330 at *23.

Because the amendments of the eighties and nineties did not change §1326 in any meaningful way, there is no need for the Court to assess these later amendments under *Arlington Heights*. Instead, the burden remains with the government to establish

---

[107] *See* Pub. L. 103-322, title XIII § 130001(b), 108 Stat. 2023 (Sept. 13, 1994) (codified at 8 U.S.C. § 1326 (1994)).
[108] Pub. L. 104-132, title IV §§ 401(c), 438(b), 441(a), 110 Stat. 1267-68, 1276, 1279 (Apr. 24, 1996) (codified at 8 U.S.C. § 1326 (2000)).
[109] *See* Pub. L. 104-208, div. C title III §§ 305(b), 308(d)(4)(J), 308(e)(1)(K), 308(e)(14)(A), 324(a), 324(b); 110 Stat. 3009-606, 3009-618 to 3009-620, 3009-629 (Sept. 30, 1996).

that Congress would have enacted the criminalization of reentry law even had the discriminatory purpose not been considered.

**F.   Amendments of § 1326 Were Motivated By Racial Animus.**

Nevertheless, should the Court find that the amendments to the statute were intervening events that broke the chain of discriminatory causation, there is ample evidence that discriminatory intent also motivated the Congress to amend §1326 in the late eighties and nineties.

The Immigration and Nationality Act of 1965 ("INA") resulted in both an influx of new Latinx immigrants and a rebranding of previous Latinx border crossers as "criminal aliens." This, combined with the "tough on crime" and "war on drugs" political platforms that had captured America's collective imagination, fueled a nativist backlash against Latinx immigrants that infected Congress and transcended party lines. Against this backdrop, FAIR drafted and promoted model legislation based on eugenics, xenophobia, and racism, became influential among members of Congress. FAIR directly shaped four of the five amendments to § 1326 either by directly drafting them for Congressmembers to introduce or by collaborating with the Congressmembers and supporting the amendments and containing legislation. These amendments were authored and sponsored by elected officials from Florida (Senator Lawton Chiles, Senator Bob Graham, and Representative Bill McCollum) working in close conjunction with FAIR, in response to a perceived crisis that the nation had lost control of its

borders.[110] As Dr. Kang concludes, each of the five amendments was "enacted with a discriminatory purpose."[111]

**1. Historical Background**. Three historical events shaped the amendments of the late eighties and nineties: the passage of the Immigration and Nationality Act of 1965 (INA); the popularity of the War on Drugs/Tough on Crime movement; and the rise of FAIR. First, Congress amended the McCarran-Walter Act with the INA, which finally removed national origin quotas and purported to eliminate national origin, race, and ancestry as a basis for immigration. But, in order to convince its opponents that the racial makeup of America would remain unchanged,[112] the INA imposed the very first quota on immigration from the Western Hemisphere.[113] The quota was far below the number of Latinx migrants who had crossed the border annually and they were turned into undocumented immigrants overnight.[114] [115] At the same time, the INA opened the door to refugees from other Latin American countries, who came at a rate far greater than the INA's proponents had promised.[116] By the early nineties, the country was experiencing the "the virulent xenophobia that emerged as a result of an economic recession ... and increases in both the legal and undocumented immigrant

---

[110] Exhibit C, Kang Decl. at 25.
[111] Exhibit C, Kang Decl. at 1.
[112] Senator Ted Kennedy, speaking in favor of the bill during a Senate debate claimed: "our cities will not be flooded with a million immigrants annually. ... Secondly, the ethnic mix of this country will not be upset." *See e.g.* Bill Ong Hing (2012), *Defining America: Through Immigration Policy*, Temple University Press, p. 95, ISBN 978-1-59213-848-7.
[113] Exhibit C, Kang Decl. at 24.
[114] Exhibit C, Kang Decl. at 25.
[115] In 1978, hemispheric limits were eliminated and replaced with worldwide quotas, but those quotas still did not account for the number of migrants that had historically crossed the Mexican-American border within a single year.
[116] Exhibit C, Kang Decl. at 24.

population."[117] The influx of immigrants shifted the racial balance, especially in border states, causing a nativist backlash, which only grew as the country headed into a recession.[118] Newly undocumented Mexican migrants, popularly believed to be unassimilable, "were blamed for nearly all of the nation's economic, social, and political problems."[119] By 1994, 64% of Americans supported a reduction in immigration.[120] [121] Opinion polls showed the highest level of hostility toward immigrants "since the heyday of nativism in the 1920s."[122] As The New York Times put it, "Americans have felt freer to voice a rude inhospitality that at other times they might have considered racist or at least xenophobic."[123] Patrick Buchanan (the presidential candidate and political commentator) revived the eugenicist notion of "race suicide," warning that white Americans would become a minority given Mexican birth rates.[124] But it was not only conservatives that pushed the nativist agenda. Historically liberal California overwhelmingly passed Proposition 187, a ballot initiative that prohibited undocumented immigrants in California from non-emergency medical care, public schools, and social

---

[117] Exhibit C, Kang Decl. at 66.
[118] Exhibit C, Kang Decl. at 25.
[119] Exhibit C, Kang Decl. at 68.
[120] Exhibit C, Kang Decl. at 67.
[121] While racism was less overt by the 1980s, it was no less present: racial slurs were simply traded for racial stereotypes of Latinx immigrants as criminals and thugs, and legislative backlash to the increase in Latinx immigrants took the form of scapegoating them in the War on Drugs, the English only movements, and anti-birthright citizenship campaigns. Exhibit C, Kang Decl. at 35.
[122] Exhibit C, Kang Decl. at 67.
[123] Exhibit C, Kang Decl. at 67.
[124] *See* Exhibit C, Kang Decl. at 68. The idea of "race suicide" has more recently been cast as the "Great Replacement Theory." According to the Anti-Defamation League, over half of the extremist murders committed in the U.S. over the past decade were carried out by people espousing such white supremacist ideologies. See John Eligon, *The El Paso Screed, and the Racist Doctrine Behind It*, N.Y.T. (Aug. 7, 2019), https://nyti.ms/3p49FZ9.

services, and required government officials including teachers and health care professionals to report suspected undocumented immigrants, even children, to the state attorney general and the INS.[125] [126] Capturing the popular mood, the headline on an April 1990 cover of Time magazine depicted an image of an American flag composed of black, brown, and yellow stripes—and asked, "What will the U.S. be like when whites are no longer the majority?"[127]

At the same time, the War on Drugs and Tough on Crime movements were seizing the popular imagination. In 1985, what was termed the "crack epidemic" was the subject of a New York Times cover story and "the War on Drugs" was well on its way to the mainstream. In September 1989, George H. W. Bush announced an escalation of the War on Drugs, and by February 1990, polling showed that an overwhelming 75 percent of Americans approved of his drug policy.[128] The popular nativist sentiment brought to the forefront familiar racist tropes that painted immigrants as criminals, this time the unfounded[129] belief that they were responsible for the drug trade ("Jamaican posses. Haitian crack syndicates.") Anti-immigrant and Tough on Crime sentiment were so popular, they transcended party lines.

---

[125] Exhibit C, Kang Decl. at 69.

[126] Although the ballot initiative was California-specific, it was a reflection of national sentiment and influenced national politics because President Clinton, who was up for reelection in 1996, knew he would not be able to win without winning California. Voters in California had approved the initiative by a margin of 59 to 41. *See, e.g.*, Exhibit C, Kang Decl. at 94-95.

[127] Exhibit C, Kang Decl. at 66–67.

[128] Morin, Richard, AMERICANS, COLOMBIANS DISAGREE OVER DRUG WAR, SURVEY SHOWS, N.Y.T. (February 9, 1990), https://www.washingtonpost.com/archive/politics/1990/02/09/americans-colombians-disagree-overdrug-war-survey-shows/e0662b42-6d7b-4b68-814a-54131d40bc68/).

[129] Exhibit C, Kang Decl. at 46-47.

At the same time, FAIR was coming to prominence. FAIR was founded by ophthalmologist and eugenicist John Tanton in 1979, with the specific aim of reducing non-white immigration to the United States.[130] In 1988, Tanton "set off a storm of protests" when journalists released a 1986 memorandum meant for seminar attendees describing a "Latin onslaught" of immigrants and pondering such questions as: "What are the differences in educability between Hispanics (with their 50% dropout rate) and Asiatics (with their excellent school records and long tradition of scholarship)?"[131] Word soon followed that FAIR received 1.2 million dollars in grants from the Francis Walter-associated Pioneer Fund, the foundation that promoted theories of the genetic superiority of whites.[132] As a result, FAIR lost the support of prominent members like Warren Buffett and Tanton resigned from FAIR in 1988.[133] An attorney named Dan Stein assumed leadership. Stein shares Tanton's racist views and agenda; in 1994, he said in a public interview with Tanton that those who supported the 1965 INA, which eliminated the quota system, wanted to "retaliate against Anglo-Saxon dominance" and that this "revengism" against whites had created a policy that is causing "chaos and will continue to create chaos."[134] During a congressional hearing on asylum seekers in

---

[130] Exhibit C, Kang Decl. at 36.

[131] *Witan Memo III*, Southern Poverty Law Center, https://www.splcenter.org/fightinghate/intelligence-report/2015/witan-memo-iii (last accessed Jan. 21, 2022).

[132] DeParle, Jason, *The Anti-Immigration Crusader,* N.Y.T. (Apr. 17, 2011), https://www.nytimes.com/2011/04/17/us/17immig.html.

[133] *Id.*

[134] Southern Poverty Law Center, "Federation for American Immigration Reform," https://www.splcenter.org/fighting-hate/extremist-files/group/federation-american-immigrationreform, last accessed April 18, 2021. By 1994, Stein also expressed his anti-Haitian sentiments during a congressional hearing on Haitian asylum seekers. In an alarmist tone, he urged the exclusion of Haitian and Global South refugees, arguing that their admission would lead to the nation's downfall. These migrants, Stein argued,

1994, he advocated for the exclusion of Latinx refugees, especially Haitians, arguing that their admission would lead to the nation's downfall.[135]

And yet, FAIR was enormously successful in maintaining a veneer of respectability, allowing it to continue to successfully promote its anti-immigrant agendas. Tanton "raised millions of dollars, groomed protégés and bequeathed institutions."[136] In 2009, Dan Stein "boasted that FAIR leaders had testified before Congress about 100 times."[137] By 1996, the chairs of *both* the Senate and House immigration subcommittees were members of FAIR's advisory board.[138]

**2.  Specific Sequence of Events Leading to the Challenged Action; Legislative History**.

*i. Anti-Drug Abuse Act of 1988.* The Anti-Drug Abuse Act was a legislative centerpiece of President Reagan's War on Drugs.[139] Senator Chiles of Florida, who collaborated with FAIR and briefed members of Congress on their behalf, was responsible for drafting the immigration provisions of the Anti-Drug Abuse Act.[140] Florida in particular had seen a large influx of Latinx immigrants, largely from Haiti and Cuba,

---

would transplant to the United States the crises of their home countries – ecological disaster, civil and political unrest, economic collapse, anarchy, and war. Lindskoog, *Detain and Punish*, 132 (citing Haitian Asylum Seekers: Hearing before the Subcommittee on International Law, Immigration, and Refugees of the Committee on the Judiciary, House of Representatives, 103rd Congress, 2nd Session, on H.R. 3663, H.R. 4114, and H.R. 4264, June 15, 1994, 221-222, 233.).
[135] Exhibit C, Kang Decl. 37, fn.126.
[136] *Id*.
[137] Exhibit C, Kang Decl. at 35-36.
[138] Exhibit C, Kang Decl. at 82, see fn. 310.
[139] Exhibit C, Kang Decl. at 44 n.155.
[140] Exhibit C, Kang Decl. at 38.

causing a particularly acute nativist reaction.[141] For instance, "South Floridians' anxieties about the new immigrants led them to initiate the nation's first English-only movement…"Miami's English only campaign was 'a vehicle for the expression of mass native white resistance to Latinization' and a 'political project aimed at symbolically reestablishing Anglo dominance.'"[142] The influx of Latinx immigrants also made them a perfect scapegoat for widespread, unfounded, accusations that they were responsible for increases in crime, especially drug crime.[143] Florida's senators echoed their constituents' nativist rationales and concerns during congressional hearings:

> Senators Hawkins and Chiles cited the problems, such as social tensions, health hazards, and increased crime in Florida resulting from the mass entries: There was discussion of the concentration of the Cubans and Haitians in a few geographic areas; particularly in Florida, and means of deterring the entries, including the Administration's interdiction program and means to assure that we discourage future waves of mass illegal entries…[144]

In 1985, Senator Chiles expressed concern that "[i]f we do not regain control of our borders ... I think that within ten years, we will not recognize the United States as the United States we see today."[145] He criticized the Supreme Court for "allowing the

---

[141] "In 1980, "South Florida saw the sudden arrival of nearly 125,000 Cubans in a mass migration known as the Mariel boatlift. An initially warm welcome quickly grew hostile." Stephens, Alexander, *Reagan's war on drugs also waged war on immigrants*, Washington Post (Oct. 27, 2021), https://www.washingtonpost.com/outlook/2021/10/27/reagans-war-drugs-also-waged-warimmigrants/).

[142] Exhibit C, Kang Decl. at 32.

[143] Exhibit C, Kang Decl. at 46; *see also* Aguirre, B. E., et al. "*Marielitos Ten Years Later: The Scarface Legacy.*" *Social Science Quarterly*, vol. 78, no. 2, [University of Texas Press, Wiley], 1997, pp. 487–507, http://www.jstor.org/stable/42864350.

[144] Summary of Hearings Held by the Senate Judiciary Subcommittee on Immigration and Refugee Policy, July 1981-April 1982, https://files.eric.ed.gov/fulltext/ED244007.pdf at 17.

[145] Exhibit C, Kang Decl. at 43.

alien to have all the constitutional rights of a citizen."[146] And he co-sponsored legislation that aimed to reduce the admissions of refugees, rescind "special rights" afforded to undocumented immigrants, and allow the U.S. military to enforce immigration laws "beyond the territorial limits of the United States."[147] With the Anti-Drug Abuse Act, Senator Chiles drew immigrants into the ambit of the War on Drugs by establishing new criminal penalties for noncitizens convicted of drug offenses and engaging the INS in the work of drug control.[148]

Appearing before the Senate Subcommittee on Immigration and Naturalization to explain the five bills, he falsely racially profiled Latinx immigrants:

> "A year ago when I introduced my package on alien felons, I found I had to describe these criminals. Today, I simply have to say: Jamaican posses. Haitian crack syndicates. [A]nd there is immediate recognition."[149]

He influenced other lawmakers by bringing law enforcement witnesses before Congress to testify, without statistical support, that Haitians bore responsibility for Florida's drug trade.[150] Senator Chiles's focus on the threat of "criminal aliens" came despite the fact that, per the General Accounting Office, *there was no objective basis for the belief that "alien involvement in crime is a serious problem.*"[151]

The provisions introduced by Senator Chiles added the concept of an "aggravated felony," curtailed the procedural rights of noncitizens, and amended §1326 to add subsection (b), which simply enhanced penalties for "criminal aliens"—up to five

---

[146] *Id.*
[147] Exhibit C, Kang Decl. at 39-41.
[148] *See* Exhibit C, Kang Decl. at 44 n.155.
[149] United States, Senate, Subcommittee on Immigration and Refugee Affairs of the Committee on the Judiciary, The Implementation of the Immigration Reform and Control Act, April 14, 1988, Serial No. J-100-60 (US GPO, 1989), 26.
[150] Exhibit C, Kang Decl. at 46.

years' imprisonment for those with a prior felony conviction, and up to 15 years for those with a prior "aggravated felony" conviction.[152] An ACLU Associate Director testified before the Senate that Senator Chiles's proposals rest on illogical substantive conclusions that "misperceive the problem" and "may be counterproductive in terms of our immigration policy objectives," noting in particular that "the problem presented by the failure to deport 'illegal alien felons'" was down to "INS' inability to adequately identify and apprehend persons subject to deportation"—and would not be helped by amending §1326.[153]

Despite this criticism, the Act passed, "creat[ing] the foundation for the ensuing amendments to the criminal penalty provisions of the nation's immigration laws."[154]

*ii. Immigration Act of 1990.* The Immigration Act of 1990 amended § 1326 by authorizing greater fines,[155] and the legislative history for this amendment is "very thin."[156] Senator Bob Graham of Florida sponsored the amendment, and Dr. Kang notes that Senator Graham "like the drafters of the [Anti-Drug Abuse Act], worked to yoke the nation's immigration agencies in the work of criminal law enforcement, particularly to make use of these agencies' broad legal authority to detain and expel unwanted migrants in the war on drugs."[157] In May 1988, Graham co-chaired the Senate committee hearing on "Haitian Narcotics Activities" although there was no statistical

---

[151] *See* Exhibit C, Kang Decl. at 46-47.
[152] *See* Pub. L. 100-690, title VII § 7345(a), 102 Stat. 4471 (Nov. 18, 1988).
[153] See Exhibit B at 46–47; Exhibit H (Hearing before the Subcommittee on Immigration and Refugee Affairs of the Committee on the Judiciary, U.S. Senate, Statement of Wade J. Henderson, April 14, 1988) at 38–40, 43.
[154] Exhibit C, Kang Decl. at 52.
[155] *See* Pub. L. 101-649, title V § 543(b)(3), 104 Stat. 5059 (Nov. 29, 1990).
[156] Exhibit C, Kang Decl. at 51.
[157] Exhibit C, Kang Decl. at 52.

reason to believe that Haitians were as likely to commit crimes as white citizens.[158] He espoused the idea that because federal immigration enforcement was underfunded, "[a]ll too often, these nomadic criminals—who are involved in the drug trade—slip away from justice because they move faster than our immigration system."[159]

   ***iii. Violent Crime Control and Law Enforcement Act of 1994 ("VCCLEA").*** In 1994, Congress passed the VCCLEA, a bill recognized as a "major driver of mass incarceration" of both citizens and noncitizens.[160] The VCCLEA included an amendment to §1326 increasing penalties and including those with misdemeanor convictions in the heightened penalty category.[161] This amendment to §1326 was authored by Representative Bill McCollum of Florida. Representing a deeply conservative and predominantly white district in central Florida, Representative McCollum dedicated his career to the reconfiguration of this country's criminal and immigration laws.[162] By 1993, he was the ranking member of both the House Subcommittee on Crime and the House Subcommittee on International Law, Immigration, and Refugees and as such, he exerted power over the tone and content in the debates on the many crime and immigration bills introduced on the floor of the House and even the Senate.[163] His legislative agenda "reflected an aversion towards Latin American migrants," and his "sustained attack on Latin American migration led many observers to criticize his immigration policy proposals for their racially discriminatory impacts and the racist ideas

---

[158] Exhibit C, Kang Decl. at 51.
[159] Exhibit C, Kang Decl. at 53.
[160] Exhibit C, Kang Decl. at 80.
[161] Specifically, the VCCLEA increased the imprisonment time for those with a prior felony conviction from up to five years to up to 10 years and for those with a prior aggravated felony.
[162] Exhibit C, Kang Decl. at 54.

that informed them."[164] He co-sponsored and endorsed measures drafted by FAIR, and he spoke at a FAIR-sponsored congressional briefing.[165] He sought to end challenges to deportation orders, to curtail the rights of asylum seekers (he claimed up to half of the entire population of Mexico would come to the United States if allowed), and to enhance penalties for unlawful entry and reentry.[166] He co-sponsored resolutions to amend the Constitution to deny birthright citizenship to the children of undocumented immigrants and to make English the official language of the United States.[167] Although Rep. McCollum was a deeply conservative lawmaker, his (and FAIR's) arguments often reached across the aisle.

Even senators that are considered today to be liberal were swept up in the xenophobic tenor of the day and convinced by anti-immigrant interest groups that expelling immigrants and closing the border was for the good of society. At the time the VCCLEA was making its way through Congress, Senator Harry Reid of Nevada proposed an amendment to § 1326 that would have barred any noncitizen from "challeng[ing] the validity of the deportation order."[168] (Senator Reid's proposed amendment would have also revoked birthright citizenship for children born to

---

[163] Exhibit C, Kang Decl. at 74.
[164] Exhibit C, Kang Decl. at 56.
[165] Exhibit C, Kang Decl. at 57-58.
[166] Exhibit C, Kang Decl. at 55-56, 58.
[167] Exhibit C, Kang Decl. at 58, 60.
[168] Exhibit C, Kang Decl. at 78-79. This was six years after the Supreme Court had held that, if §1326 "envisions that a court may impose a criminal penalty for reentry after any deportation, regardless of how violative of the rights of the alien the deportation proceeding may have been, the statute does not comport with the constitutional requirement of due process." *U.S. v. Mendoza-Lopez*, 481 U.S. 828, 837 (1987).

undocumented immigrants.).[169] Senator Reid later apologized for his proposed amendment, calling it "the biggest mistake I ever made," and blaming interest groups that had "convinced us that the thing to do would be to close the borders between Mexico and the United States; in effect, stop people from coming across our borders to the United States."[170]

Reid's proposed bar on challenging the validity of removal orders in § 1326 prosecutions did not become part of the VCCLEA, but it demonstrates how McCollum's amendment to §1326 and the VCCLEA gained sufficient bipartisan support to pass.

***iv. Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").*** Two months after the passage of the VCCLEA, the Republican Party took control of Congress for the first time in 40 years and supplanted Democrats from the chairs of the Senate and House immigration committees.[171] The new committee chairs were both on the advisory board of FAIR. Because McCollum ultimately voted against the VCCLEA because he believed the VCCLEA had "not gone far enough," he seized the opportunity to introduce a bill to limit collateral attacks on removal orders in §1326 prosecutions.[172] The Supreme Court had previously held that noncitizens have a constitutional right to collaterally attack their predicate removal order in a §1326 prosecution. *U.S. v.*

---

[169] Exhibit C, Kang Decl. at 79. In a September 3, 1993 floor speech, Sen. "Reid also declared that 'no sane country' would confer birthright citizenship to out-of-status parents."
[170] Exhibit C, Kang Decl. at 79.
[171] Exhibit C, Kang Decl. at 82, *see also* Kang Decl. 82 fn. 310. "Senator Alan Simpson (R-WY) replaced Sen. Kennedy as chair; in the House, Rep. Lamar Smith (R-Tex.) supplanted Rep. Romano Mazzoli (D-KY). Both members of FAIR's National Advisory Board, Simpson and Smith "envisioned a fresh round of restrictive immigration reform to limit legal admissions, to make immigrants ineligible for welfare benefits, and to finally curb illegal immigration."
[172] Exhibit C, Kang Decl. at 83.

*Mendoza-Lopez,* 481 U.S. 828 (1987). Section 1326(d) cabined that right by adding requirements of judicial and administrative exhaustion found nowhere in the Supreme Court's decision. Two other amendments increasing penalties to § 1326 were authored by Representative Mark Foley of North Carolina, who had previously introduced a constitutional amendment to deny birthright citizenship to the children of undocumented immigrants.[173] All of those amendments became part of AEDPA, which was passed into law in 1996.[174]

It's important to understand AEDPA in its historical context. In October 1994— one month before the midterm elections—President Clinton faced pressure to take further action against border crossings and launched Operation Gatekeeper.[175] This operation placed hundreds of federal officers on the border as a "visible show of force," with the predictable result that migrants altered their routes and attempted dangerous journeys through the inhospitable desert, transforming the Arizona borderlands into a "killing field."[176] Despite President Clinton's efforts, the Republicans took control of the House in January 1995. FAIR was elated and began promoting its immigration agenda aggressively.[177] As the head of FAIR put it, "We expected to see the tightening up of the whole deportation process, eliminating needless appeals, presumption in favor of

---

[173] Exhibit C, Kang Decl. at 60, 84. These amendments established penalties for individuals who reenter after being excluded under §1225(c) and mandated incarceration for individuals who reenter after being deported by judicial order. See 8 U.S.C. §1326(b)(3), (c).

[174] *See* Pub. L. 104-132, title IV §§ 401(c), 438(b), 441(a), 110 Stat. 1267-68, 1276, 1279 (Apr. 24, 1996).

[175] Exhibit C, Kang Decl. at 81.

[176] Exhibit C, Kang Decl. at 81.

[177] Exhibit C, Kang Decl. at 90.

detention, curtailing of asylum, and summary exclusion at the border."[178] FAIR got what it expected. In June 1995, Speaker Newt Gingrich's Task Force on Immigration Reform proposed dramatic increases in "resources to prosecute deported felons who illegally re-enter"—along with streamlined deportation proceedings, mandatory prosecution of certain noncitizens, an end to birthright citizenship for the children of undocumented immigrants, and the denial of public benefits (including public education) to undocumented immigrants.[179]

When Congress took up debate on AEDPA, "both Democrats and Republicans strove to win the votes of [the] anti-immigrant electorate in anticipation of the 1996 elections."[180] Representative Gerald Solomon of New York made racist complaints about the number of children born to undocumented immigrants.[181] Representative Lamar Smith of Texas urged passage of the bill by stressing that it would cut down on challenges to deportation orders.[182] And Representative McCollum explained the amendment to § 1326 would limit challenges to predicate removal orders.[183] Congress passed AEDPA, and President Clinton signed it into law. Along with the aforementioned amendments to § 1326, AEDPA expanded the offenses considered aggravated felonies, eliminated long-term residency as a defense to deportation, expanded the pool of undocumented immigrants who could be deported expeditiously, and authorized wiretap authority for immigrant-smuggling investigations.[184] Three years later, even

---

[178] Exhibit C, Kang Decl. at 90.
[179] Exhibit C, Kang Decl. at 82, fn. 312.
[180] Exhibit C, Kang Decl. at 88.
[181] Exhibit C, Kang Decl. at 87.
[182] Exhibit C, Kang Decl. at 84.
[183] Exhibit C, Kang Decl. at 84.
[184] Exhibit C, Kang Decl. at 83-84.

Representative McCollum would concede AEDPA "went too far."[185] As he put it, "We are a just and fair nation and must strike a just and fair balance in our immigration laws."[186] Representative McCollum gave two examples of noncitizens treated unfairly by the law. Tellingly, neither were Latinx: one was Bob, a Scotsman deported for a dated crime; the other was Robert A. Broley, the son of the Republican Party treasurer in Orange County, Florida, who was convicted on felony fraud charges and deported to Canada.[187]

*v. Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA").* Later in 1996, Representative Lamar Smith of Texas (a member of FAIR's National Advisory Board and the chairman of the Immigration Subcommittee of the House Judiciary Committee) introduced IIRIRA, also known as "The Mexican Exclusionary Act."[188] Representative Smith argued "there exists an inchoate sense among the American people that our culture is changed by immigration"—and promised IIRIRA would correct laws that viewed "immigration as a form of 'civil right' that is owed to an unspecified portion of the world's population without regard to objective criteria of selection based in the national interest."[189] It was widely understood that Cordelia Strom, formerly of the Immigration Reform Law Institute (FAIR's litigation arm), drafted the bill for Representative Smith.[190] In fact, many considered that "Lamar Smith, in effect, turned the congressional immigration subcommittee over to FAIR."[191]

---

[185] Exhibit C, Kang Decl. at 89.
[186] Exhibit C, Kang Decl. at 89.
[187] Exhibit C, Kang Decl. at 90, fn. 388.
[188] Exhibit C, Kang Decl. at 90, fn. 310, 91.
[189] Exhibit C, Kang Decl. at 91.
[190] Exhibit C, Kang Decl. at 90-91.
[191] Exhibit C, Kang Decl. at 91.

IIRIRA amended § 1326 by broadening its scope to include those removed (as opposed to deported), and authorizing up to 10 years' imprisonment for noncitizens who reenter after being removed while on parole, supervised release, or probation for a nonviolent offense.[192] In addition to these amendments, IIRIRA eliminated family reunification visas for siblings and adult children, capped humanitarian admissions, limited asylum claims, expanded the definition of an aggravated felony, and expedited the removal of so-called "criminal aliens."[193] Opponents of IIRIRA drew attention to the racial animus underlying the bill. Representative Xavier Becerra of California pointed out the substantive irregularity that the bill targeted border-crossers when the majority of undocumented persons in the United States were actually visa overstays.[194] Representative Jerrold Nadler of New York argued the bill's "mindless cruelty" and its "good old-fashioned Xenophobia" had "nothing to do with legitimate protection of our borders."[195] But, as Dr. Kang notes, "the pressure to appear tough on undocumented immigration was particularly acute given that 1996 was an election year," and the bill was passed into law.[196] IIRIRA had its intended effect. Following its passage, deportations from the United States jumped precipitously—massively increasing the pool of individuals who could be charged with violations of § 1326 should they return.[197] It is no coincidence that criminal immigration proceedings then jumped tenfold.[198]

---

[192] See Pub. L. 104-208, div. C title III §§ 305(b), 308(d)(4)(J), 308(e)(1)(K), 308(e)(14)(A), 324(a), 324(b); 110 Stat. 3009-606, 3009-618 to 3009-620, 3009-629 (Sept. 30, 1996).
[193] Exhibit C, Kang Decl. at 92.
[194] Exhibit C, Kang Decl. at 93.
[195] Exhibit C, Kang Decl. at 92.
[196] Exhibit C, Kang Decl. at 94-95.
[197] In 1994, there were just over 50,000 removals. In just two years, that number had more than doubled. By 2019 (the latest year with records), there were nearly 360,000

These amendments, which were purposefully designed to enhance, not mitigate, the visibly disparate impact of § 1326 were continuations of the chain of discriminatory causation begun in 1929. Instead, they came about from another wave of nativism, enacted by Congressmembers on both sides of the aisle, either succumbing to popular sentiment themselves, or putting aside their own morals to enforce the will of their constituents. Accordingly, the government cannot meet its burden to show that the law would have been enacted without the motivating factor of racial discrimination.

## III.      CONCLUSION

The racist history of § 1326 is, at bottom, the history of countless individual Latinx lives ruined, and degraded, by application of this unjust law. Nationwide, one-third of the federal docket is §1326 prosecutions. Each year, there are thousands and thousands of initial appearances, arraignments, detention hearings, changes of plea, and sentencings for impoverished Latinxs encouraged to come work this country's fields, only to be locked up for daring to cross the border. Meanwhile, Anglo employers cast cursory glances at undocumented Latinx laborers' papers, knowing there is no realistic threat of the government cracking down on their unlawful hiring practices. Doing so would disturb the nearly century-old arrangement: a steady supply of exploitable Latinx labor for Anglo profit, but with criminal laws on the books to punish and drive out the "mongrels" and "criminals" when needed. Criminal laws that have become only more draconian with each wave of nativism.

removals. Dep't of Homeland Sec., Aliens Removed or Returned: Fiscal Years 1892 to 2019 (2009), https://bit.ly/3Eb0Sci.
[198] Exhibit C, Kang Decl. at 96.

The Constitution demands that courts examine criminal statutes for discriminatory intent and disparate impact in order to ensure equal protection under the law. One cannot uncouple §1326's history from the history of anti-Latinx racism in the United States. But joining Judge Du in recognizing that §1326 offends the Constitution would acknowledge that sordid history and allow the country to begin to address it.

Accordingly, Mr. Gamez-Reyes respectfully requests that the Court find that §1326 violates the Fifth Amendment's equal protection guarantee and dismiss the indictment against him.

Respectfully submitted, this 7th day of March, 2022.

VIRGINIA L. GRADY
Federal Public Defender

*s/ Jared Scott Westbroek*
JARED SCOTT WESTBROEK
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
Email:  jared_westbroek@fd.org
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2022, I electronically filed the foregoing **GERARDO GAMEZ-REYES' MOTION TO DISMISS THE INDICTMENT** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

 Valeria N. Spencer, AUSA
 Email: Valeria.Spencer@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

 Gerardo Humberto Gamez-Reyes via U.S. Mail


    *s/ Jared Scott Westbroek*
    JARED SCOTT WESTBROEK
    Assistant Federal Public Defender
    633 17th Street, Suite 1000
    Denver, CO  80202
    Telephone:  (303) 294-7002
    FAX:  (303) 294-1192
    Email:  jared_westbroek@fd.org
    Attorney for Defendant